Frank J. ELLIS, Appellee,

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE, Appellant.**

No. 9899.

United States Court of Appeals Fourth Circuit.

Argued May 31, 1965.

Decided Oct. 11, 1965.

Clayton A. Dietrich, Chief Asst. Sol., City of Baltimore, Md. (Joseph Allen, City Sol. of Baltimore, Md., and Harold L. Glaser, S. Leonard Rottman and Solomon Baylor, Asst. City Sol., on brief), for appellant.

Archie D. Williams, Baltimore, Md., for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF, BRYAN and J. SPENCER BELL, Circuit Judges.

SOBELOFF, Circuit Judge:

■ The present apportionment and a proposed reapportionment of the Baltimore City Council were declared unconstitutional by the United States District Court for the District of Maryland. This is the municipality's appeal from that decision. Jurisdiction is founded on 28 U.S.C.A. § 1343(3) and 42 U.S.C.A. §§ 1983 and 1988.[1]

Plaintiff, a resident and registered voter of the Fifth Councilmanic District of Baltimore City, brought suit on his own behalf and on behalf of all voters in Baltimore City who are similarly situated.

■ In his initial complaint he contended that the apportionment scheme, set out in sections 16 and 20 of the 1946 Charter and Public Laws of Baltimore City (1949 ed.),[2] is void in that it violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. As those sections apportioned to a voter in the Second District three times the voting power of one in the Third District, the District Court found the Equal Protection Clause had been violated. The merit of this part of the decision is not, and could not successfully be, contested in this appeal, for the "one man, one vote" principle, infra, 352 F.2d 126 logically applies to councilmanic no less than to statewide apportionment.

Before the suit came on for hearing, indeed contemporaneously with its initiation, in April, 1963, the Mayor appointed a committee to draw up a reapportion-

1. Because of the importance of the case the District Judge to whom it was assigned invited two of his colleagues on the court to sit with him. A statutory three-judge court was not required pursuant to the provisions of 28 U.S.C.A. § 2281 because the court was considering an attack on the constitutionality of a city ordinance, not a state statute. Bianchi v. Griffing, 238 F. Supp. 997 (E.D.N.Y.1965) ; Davis v. City of Little Rock, 136 F.Supp. 725 (E.D.Ark. 1955) ; see Ex Parte Collins, 277 U.S. 565, 48 S.Ct. 585, 72 L.Ed. 990 (1928).

2. The Charter was amended in 1964 after the commencement of this suit. Sections 16 and 20 of the 1946 Charter were carried over without significant change to the 1964 Charter, Art. III, §§ 2 and 7.

ment plan for the city. This group, known as the Bard Commission in deference to its chairman, Dr. Harry Bard, submitted its report on April 23, 1963. The report proposed a new apportionment plan commonly referred to as Plan X. This, as amended by the City Council, was embodied in Resolution No. 9, passed on May 16, 1963.

The plan was then to be submitted to the voters for their approval at the election in November, 1964.[3] The plaintiff thereupon amended his complaint to attack, again on equal protection grounds, this proposed remedy for the malapportionment. The District Court found this plan, like that in the 1946 Charter, unconstitutional, and enjoined its submission to the voters of Baltimore City. It is from this part of the court's decision, invalidating Modified Plan X, that the city appeals.

Modified Plan X redraws the boundaries of Baltimore's six councilmanic districts and awards three councilmen to each district having less than 70,000 registered voters, four to each district with voters in excess of that number.[4]

The District Court concluded that this plan is unconstitutional in two respects: first, that it gives voters of the First District a disproportionate voice in the selection of city councilmen; and second, that the representation of Fourth District residents is irrationally diluted vis-a-vis that of Fifth District residents.

## I

We agree with the District Court as to the overly generous treatment of the First District. Under Modified Plan X a councilman from the First District would represent 12,370 registered voters while a councilman from the Third would represent 21,193, a variation in the ratio of 1.71 to 1. When we look to total population, rather than voter registration, the discrepancy is almost as striking. A First District councilman would represent 34,367 persons while a Second District councilman would represent 56,930, a variation in the ratio of 1.66 to 1.

In our opinion the District Court was eminently reasonable in holding that a seventy percent variance in voting strength does not constitute "faithful adherence to a plan of population-based representation." Roman v. Sincock, 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620 (1964). The record offers no justification for this discrepancy except the city's contention that the Bard Commission, the authors of the predecessor of Modified Plan X, considered such factors as neighborhood, state legislative districts, economics, etc. A study of the Commission report and of the testimony of its chairman fails to indicate concretely how these factors required or warranted the substantial imbalance in favor of the First District. Furthermore, the City Council made an unexplained reduction of approximately

---

3. Section 5 of Art. XI–A of the Constitution of Maryland confers upon the Mayor and City Council of Baltimore authority to amend its Charter by Resolution of the City Council, approved by the voters.

4.

### Proposed Districts
### (Modified Plan X)

| Councilmanic Districts | Numbers of Councilmen | Population (1960 Census) | Voters (Registered July, 1964) | Each Councilman Represents | |
|---|---|---|---|---|---|
| | | | | Population | Voters |
| 1 | 3 | 103,102 | 37,110 | 34,367 | 12,370 |
| 2 | 3 | 170,789 | 56,416 | 56,930 | 18,805 |
| 3 | 4 | 183,425 | 84,771 | 45,856 | 21,193 |
| 4 | 3 | 166,263 | 59,750 | 55,421 | 19,917 |
| 5 | 4 | 162,644 | 73,728 | 40,661 | 18,432 |
| 6 | 3 | 152,801 | 45,038 | 50,934 | 15,013 |

20% in the size of the First District from that proposed by the Commission, thereby aggravating the discrimination in favor of that district. The chairman of the Commission, appearing as *amicus curiae*, testified that he was unhappy with this amendment though he was apparently willing to acquiesce in it.

■ The city may not justify a significant departure from the principle of "one man, one vote" by a vague and unsupported reference to abstract considerations. Justification for divergences from the norm may be found only in specific proof of permissible considerations that necessitated the particular variance. Davis v. Mann, 377 U.S. 678, 691, 84 S.Ct. 1453, 12 L.Ed.2d 609 (1964).

No such justification has been tendered in this case.

## II

The second ground relied on by the District Court for enjoining the submission of Modified Plan X to the voters of Baltimore presents a more difficult problem. The total populations of the proposed Fourth and Fifth Districts are approximately equal, yet the Fifth District would have four councilmen while the Fourth would be allowed only three. This disparity results from the fact that Baltimore, pursuant to section 16 of its Charter, bases its apportionment on the number of registered voters in a district, rather than the total population.[5]

5. Counsel for both sides have assured us that the Baltimore Charter makes *mandatory* the use of registration rather than total population as the measure for councilmanic apportionment. After reviewing the present Charter and its history we cannot share their certainty.

First, as to the history of these Charter provisions: The 1898 City Charter, as enacted by the Maryland Legislature, provided for a bicameral City Council. (Before the adoption of Art. XI-A of the State Constitution in 1914 all municipal charters were the product of the General Assembly.) The upper house was to be apportioned on the basis of existing wards and the lower house, the precursor of the present unicameral City Council, was to be elected at large until the city was divided into four districts "which shall each contain as near as possible one-fourth of the *population* of the City of Baltimore * * *." (Italics supplied.) Laws of Maryland 1898, Chap. 123, § 211. No reference was made in this section, or any related section, to registered voters. This provision was continued in effect until the Charter of 1918 was adopted, which instructed the Mayor to appoint a commission to "divide and apportion the City of Baltimore into six councilmanic Districts, as near as may be, of equal *population* * * *." (Italics supplied.) A duly appointed commission performed this task and filed its results with the Supreme Bench on January 22, 1923, giving the city six districts based on total population.

Over the next twenty years the six districts, equal in population in 1923, grew unevenly, while retaining the same number of city councilmen. This inequity led a

charter revision committee to suggest, in its report of November 14, 1945, that a provision be added to the Charter to permit adjustment in representation as the size of the districts fluctuated. The suggestion was effectuated by section 16 of the 1946 Charter, which provided that:

"The number of members to be elected from each District shall be determined as follows: three members for each District in which there are not more than 75,000 *voters* * * *; four members for each District having more than 75,000 such *voters* * * *." (Italics supplied.)

The same Charter provided in section 20 that the district boundaries drawn in 1923 on the basis of total population should remain in effect. Both provisions were carried over into the 1964 Charter intact. See Art. III, §§ 2 and 7. The 1964 Charter amended the predecessor Charter of 1946 in a number of respects, but did nothing to correct the imbalance in councilmanic representation.

Nowhere do we find an explicit *mandate* to use registration in drawing new districts. Such a requirement is inferred by the parties from section 16 of the 1946 Charter, and its successor, Art. III, § 2 of the 1964 Charter, which allots councilmen according to the registered voter strength of the several districts. The section designating the boundaries of the districts, § 20 of the 1946 Charter and Art. III, § 7 of the 1964 Charter, refers to the 1923 boundaries which were drawn pursuant to the previous mandate to rely on total population as the norm.

The parties are in agreement in their reading of the present provisions of the Charter to require allotment of council

Looking to the registration figures we find that there are 59,750 registered voters in the proposed Fourth District and 73,728 in the Fifth. Basing its apportionment plan on registration, the Commission and in turn the City Council approved a plan giving the Fifth District one more city councilman than the Fourth. This means that a Fourth District councilman would represent 19,917 registered voters while one from the Fifth would represent 18,432, an acceptable variance of less than three percent if *voter registration* is a permissible basis.

The District Court, however, found that the proposed plan would deny residents of the Fourth District equal protection in giving them one less councilman than an approximately equal number of *persons residing* in the Fifth District.

This additional ground which was assigned by the District Court for voiding Modified Plan X necessarily stems from three prior determinations, the latter two being implicit: first, that the constitutionality of an apportionment plan is to be tested by its impact on total population rather than on the number in a given community who are registered to vote; second, that a variance of 1 to 1.37, the approximate disproportion in representation of the respective populations of the Fourth and the Fifth Districts arising from the use of registration rather than total population as a test, is presumptively too wide a departure from the equality norm; and third, that registration is not a "factor free from arbitrariness or discrimination" justifying the variance. The contention of the appellant is that, constitutionally, total population is not the sole test and that a plan may meet constitutional standards if it satisfies an equality test based on voter registration. We shall set forth the appellant's argument fully and then state our reasons for agreeing with the District Court in rejecting it.

The appellant's argument is developed as follows: The Supreme Court's reference in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), to "population" as the "starting point" for consideration and the controlling criterion for judgment in legislative apportionment controversies, 377 U.S. at 567, 84 S.Ct. 1362, does not, according to appellant, preclude the use of other rational criteria, such as voter registration. He contends that the Supreme Court has indicated that the term "population" is subject to reasonable definition by the political unit that is apportioning itself and that in his opinion the Court repeatedly equated the term "population" with voters. He points to page 577, at page 1390 of 84 S.Ct., of Reynolds, where the Court stated, "We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of *residents*, or *citizens*, or *voters*." (Italics added.) It is also noted that in the sentence immediately following the reference to "population" as the "controlling criterion," the Supreme Court referred to "citizens" and "qualified voters" without distinction. 377 U.S. at 568, 84 S.Ct. 1262.

Further reliance is placed by the appellant on the fact that the Constitution of Tennessee, the state whose apportionment was contested in the seminal case, Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), defines "population" as "qualified voters," that is, persons over 21, and no objection was voiced on this score. See Baker v. Carr, 222 F.Supp. 684 (M.D.Tenn.1963); 206 F. Supp. 341, 344 (M.D.Tenn.1962). However, that issue was not presented and the Court did not directly address itself to it.

The appellant suggests that a more explicit indication of the Supreme Court's view is to be found in New York's apportionment case. WMCA, Inc. v. Lomenzo, 377 U.S. 633, 647–651, 84 S.Ct. 1418, 12 L.Ed.2d 568 (1964). That state

---

seats on a voter registration basis. As this is not plainly unreasonable, we will, for the purposes of this opinion and without finally deciding the point, accept their interpretation.

defines population as total population less aliens. N.Y.Constitution, Art. III. The Court cited this provision and proceeded to demonstrate the inequities of New York's apportionment by referring to calculations based on the prevailing citizen population test rather than total population. On remand a three-judge District Court expressly held that a test more restrictive than total population, in that instance "citizens," was not forbidden. WMCA, Inc. v. Lomenzo, 238 F. Supp. 916, 925 (S.D.N.Y.1965), affirmed, 86 S.Ct. 24 (1965). The District Court, however, specially noted that the use of "citizen" population, rather than "resident" population, affected all areas of the state substantially equally.[6]

Recently, in approving Vermont's use of registered voters as the basis for apportioning its lower house, Judge Waterman, for a three-judge District Court, said:

"[I]n particular cases the selection of * * * registered voters may violate the Equal Protection Clause, if it evidences an attempt to perpetuate prior malapportionment * * *" but there was "no evidence that the selection of registered voters as a base for apportionment * * * has the effect of perpetuating existing discrimination * * *." Buckley v. Hoff, 243 F.Supp. 873 (D.Vt. 1965).[7]

We recognize the force of the arguments predicated upon these decisions. Nevertheless, we think that the appellant overlooks the true thrust of the cases.

For example, in Reynolds v. Sims, supra, relied on by the appellant, the Supreme Court also said:

"* * * Wesberry clearly established that the fundamental principle of representative government in this country is one of equal representation for *equal numbers of people,* without regard to race, sex, economic status, or place of residence within a State." 377 U.S. at 560–561, 84 S.Ct. at 1381. (Emphasis supplied.)

And at page 581 of the same opinion, at page 1392 of 84 S.Ct., the Court admonished:

"And careful judicial scrutiny must of course be given, in evaluating state apportionment schemes, to the character as well as the degree of deviations from a strict population basis. But if, even as a result of a clearly rational state policy of according some legislative representation to political subdivisions, population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all of the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired."

Significantly, the Supreme Court in WMCA, Inc. v. Lomenzo, 377 U.S. 633, 653, 84 S.Ct. 1418, 1428, 12 L.Ed.2d 568 (1964), described its holding in the Reynolds case in the following terms:

"In Reynolds v. Sims, ante, p. 533 [84 S.Ct. 1362], decided also this

---

6. Similar reasoning was adopted in Holt v. Richardson, 238 F.Supp. 468 (D. Hawaii 1965), appeal pending, 34 U.S.L. Week 3083 (Sept. 14, 1965), to sustain Hawaii's use of a registered voter test to apportion its legislature. There the state submitted evidence showing that a breakdown of population between citizens and noncitizens was locally unavailable, and that "[a]s a practical matter, the number of registered voters was found to bear a reliable and fairly uniform relationship to total population, although it favors slightly the neighbor islands where the percentage of persons who have registered to vote is from one to two per cent

higher than for Oahu. It was in recognition of the *potential difficulty in obtaining* figures which would show citizen population, or figures which would show total population by desirable districts, that the basis for reapportionment of the members of the House was chosen as the number of registered voters." 238 F. Supp. at 473.

7. However, in this case, as in Holt v. Richardson, n. 6 supra, the use of a registered voter test bore a substantially uniform relationship to each district's total population. In no instance was the variance greater than 3%.

date, we held that the Equal Protection Clause requires that seats in both houses of a bicameral state legislature must be apportioned substantially on a population basis."

This language was repeated in Maryland Committee v. Tawes, 377 U.S. 656, 674, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964); Davis v. Mann, 377 U.S. 678, 690, 84 S.Ct. 1453, 12 L.Ed.2d 609 (1964); Roman v. Sincock, 377 U.S. 695, 708, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964); Lucas v. Colorado General Assembly, 377 U.S. 713, 734, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964).

Again articulating the spirit which has pervaded all its opinions in the field of legislative reapportionment, the Court, in Roman v. Sincock, supra, spoke as follows:

> " * * * [T]he proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual State whose legislative apportionment is at issue, there has been a faithful adherence to a plan of population-based representation, with such *minor deviations only* as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination." 377 U.S. at 710, 84 S.Ct. at 1458. (Emphasis supplied.)

Appellant must concede that in this case the use of a registered voter test does not affect all areas of the city's population equally or nearly so. For example, in the Sixth District voter registrants are 30% of the population, while in the Third District voter registrants constitute 46% of the population—a 53% variation.

When we look to the impact of a registered voter test on the *representation* accorded the total populations of the Fourth and Fifth Districts we find disparity exceeding 33%.[8] This is no insignificant departure from the criterion of population made mandatory by the Constitution as interpreted by the Supreme Court.

■■ This is not to say that no departure whatsoever from strict population count is ever permissible; but when the formula adopted results in more than a minor deviation, it is at once suspect. Roman v. Sincock, 377 U.S. 695, 710, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964). When the resulting disparity is as wide as in this case, the constitutional limitation has been transcended. It is notable that in no instance has a formula been approved which deviates so considerably from the census population count.

Finally, the argument is pressed upon us that there was no contention in the District Court that the Baltimore apportionment scheme based on registered voters would operate "to minimize or cancel out the voting strength of racial or political elements of the voting population." Fortson v. Dorsey, 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965). There was indeed no intimation from any source that the exercise of the right to register and vote in the city of Baltimore is inhibited in any way by public or private pressures. But the danger inherent in the validation of a voter registration base is that it is readily susceptible of abuse, and if abuses should arise the burden of proving them would be difficult to sustain. Whether the mere possibility of such abuse is sufficient to invalidate the voter registration formula has not been adjudicated so far as we

---

8. The Fourth District is represented by three councilmen, the Fifth by four. Yet these districts are substantially equal in population. See n. 4, supra.

It is paradoxical that the complaining party in this case is a registered voter in the Fifth District, which under Modified Plan X is accorded greater representation than its total population merits. No point was made of the plaintiff's standing, perhaps because he was not attacking the plan as it related to the Fourth vis-a-vis the Fifth District. However this may be, as the question is inseparable from the rest of the case and was fully considered in the District Court, we feel obliged to deal with it.

know.[9] The point need not be decided in this case for, as we have shown, another ground requires the invalidation of the Charter provision under consideration, namely, that measuring representation by registered voter strength instead of total population works too wide a disparity in the relative value of votes in the several districts.

 As above stated, the parties read the present Charter as requiring, not merely permitting, voter registration to be used as the basis for allocating councilmen to the several districts. It may be that the draftsmen of the plan under review were mistaken in thinking that they were constrained by the terms of the Charter to apportion according to registered voter strength rather than total population, and it is possible that those who will be called on to prepare a new plan would be disposed to apportion according to population if they felt free to do so. Of course, even if the language of the present Charter is correctly read as requiring registration-based apportionment, the City Council Resolution can easily amend the Charter by deleting this requirement and substituting the prime basis—population, which is constitutionally unassailable beyond question. The amendment may be submitted to the voters at the same time as the redistricting proposal. In a practical sense, and apart from any constitutional questions, there is no *compulsion* on the city to adhere to the voter registration standard.[10] It is pertinent also to consider that fluctuations in the number of registered voters in a given election may be sudden and substantial, caused by such fortuitous factors as a peculiarly controversial election issue, a particularly popular candidate, or even weather conditions. See Weinstein, "The Effect of the Federal Reapportionment Decisions on Counties

and Other Forms of Municipal Government," 65 Colum.L.Rev. 21, 24 n. 12 (1965).

With full appreciation of the complexity of the task undertaken by the City Council under the guidance of the Commission, we share, for the reasons stated, the District Court's view that the plan must be further modified to meet constitutional standards.

The decree of the District Court enjoining submission of Modified Plan X will be affirmed and the case remanded for the court to exercise its retained jurisdiction consistent with the views expressed in this opinion.

---

9. It is perhaps pertinent to remark that the citizen population test, approved in WMCA, Inc. v. Lomenzo, 238 F.Supp. 916, supra, and the qualified voters test, i.e., persons over 21, unobjected to in Baker v. Carr, 222 F.Supp. 684, supra, are not susceptible of such abuse, for in those

cases representation was not dependent upon political conduct of members of the population, as is the case with registration.

10. See n. 5 supra.