361 F.2d 495
 J. E. Clayton DAVIS, Rolland D. Winter, Cornelius D. Scully,
and Howard W. Martin, Appellants,
v.
Frank A. DUSCH, Member, City Council, City of Virginia
Beach, et al.,Appellees.
 No. 10592.
 United States Court of Appeals Fourth Circuit.
 Argued May 4, 1966.
Decided May 30, 1966.
 
 Henry E. Howell, Jr., Norfolk, Va. (Howell, Anninos & Daugherty, Norfolk, Va., on brief), for appellants.
 Harry Frazier, III, Richmond, Va. (Harry T. Marshall, City Atty., Virginia Beach, Va., and Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., on brief), for appellees.
 Before BOREMAN, BRYAN and BELL, Circuit Judges.
 ALBERT V. BRYAN, Circuit Judge:
 
 
 1
 Apportionment of councilmen of the City of Virginia Beach, Virginia, among its seven boroughs presents this controversy. The original allocation in the city charter was annulled by the District Court in an earlier proceeding,[1] as denying the electorate one-person-one-vote equality.[2] The charter was then amended by the General Assembly of Virginia in the January-March 1966 session to provide a new plan.[3] To a renewed attack on the same ground, the District Court held the present pattern impregnable. The holding is now appealed and this court reverses.
 
 
 2
 The contested allotment of members of the council, the governing body of the city, is commonly known as the Seven-Four plan. It provides for 11 councilmen, all to be selected by the qualified voters throughout the entire city. However, 7 members are apportioned among 7 boroughs, one to each borough who must be a resident of that borough. The remaining 4 members are assigned to the city at large and may reside anywhere within its corporate limits.
 
 
 3
 The boroughs, their respective sizes and populations are as follows:
 
 
 4
 Area in 1960
Square Miles Borough Population
 34 Blackwater 733
 94.4 Pungo 2,504
 58.6 Princess Anne 7,211
 36.6 Kempsville 13,900
 47 Lynnhaven 23,731
 28 Bayside 29,048
 2.4 Virginia Beach 8,091
 
 
 5
 The present City of Virginia Beach is the result of a consolidation on January 1, 1963 of the previous city of that name and the adjoining Princess Anne County. At that time the County was divided into 6 magisterial districts corresponding with, and having the same names as, the present boroughs, except that the borough of Princess Anne was formerly Seaboard District. Each district elected a supervisor, and these 6 supervisors constituted the governing County Board of Supervisors. The old City of Virginia Beach had 5 councilmen. The new City's council membership was a combination of the 6 former County positions and the 5 former city positions. However, as will have been noted, 5 councilmen of of the old city are now disposed as follows: to the Virginia Beach borough 1 and to the new city at large 4.
 
 
 6
 The earlier city was, as is now the borough of Virginia Beach, an oceanside resort looking mainly to summer tourists for its economy. Princess Anne County was formerly half urban and half rural. The new city encompasses about 301.6 square miles, of which 79.6 is water. As found by the District Court, the boroughs are generally of the following character:
 
 
 7
 Blackwater is agricultural and is expected to continue so for many years.
 
 
 8
 Pungo is 'essentially rural'.
 
 
 9
 Princess Anne, formerly the county seat and now containing the administrative agencies and the State courts, is 'still primarily agricultural in nature'.
 
 
 10
 Kempsville is changing rapidly from rural to urban.
 
 
 11
 Lynnhaven is 'residential area with predominantly urban characteristics'.
 
 
 12
 Bayside 'has a considerable quantity of farm land' but as a suburb of the City of Norfolk many of its tracts have been developed for residential occupancy and the borough has taken on an urban complexion.
 
 
 13
 Virginia Beach as a borough continues to be a seaside resort as it has always been.
 
 
 14
 To sustain the 7-4 formula, substantial reliance is put in the requirement in the 1966 Act that the city-wide voters elect all the councilmen. Thus it is stressed, the ballots of voters in the smaller boroughs are not accorded grater weight than those cast in the larger boroughs: the small-borough voter's ballot is not more effective in electing a councilman than that of the large-borough elector. Correspondingly, the value of the largerborough vote does not exceed that of the smaller-borough vote. The one-personone-vote mandate is thus purportedly obeyed.
 
 
 15
 But full compliance with the 14th Amendment's Equal Protection Clause, we think, is still wanting. The principle of one-person-one-vote extends also to the level of representation, and exacts approximately equal representation of the people-- that each legislator, State or municipal, represent a reasonably like number in population. But that is not achieved in the 7-4 plan; the imbalance in representation in the council is obvious.
 
 
 16
 For example, Blackwater containing 733 people will have the same assured representation as the borough of Lynnhaven with 23,731 persons, or Bayside with 29,048, or Kempsville with 13,900. Similar contrasts are evidence. This disparateness is not cured by the citywide election provision. 'It is the distribution of * * * (members) rather than the method of distributing * * * (them) that must satisfy the demands of the Equal Protection Clause.' Burns v. Richardson, 86 S.Ct. 1286, fn. 4, 16 L.Ed.2d 376 (U.S. April 25, 1966).
 
 
 17
 Nor is this unequivalence of representation evened by the stipulation for 4 atlarge councilmen to represent all of the boroughs. Their election would in no circumstances equalize the representation of the larger boroughs with that of the smaller. True, Lynnhaven and Bayside as the two largest boroughs populationwise could, if they collaborated, elect all of the 4 members. However, if each elected 2, and even if these were considered as in actuality councilmen of that borough alone, giving it 3 members, the numerical representation per councilman would be far greater than that of Blackwater's member or Pungo's. Indeed, this would be so if all 4 at-large councilmen came from the largest borough, Bayside. Consequently, to repeat, the provision for 4 city-wide members does not remedy or in any way affect the disproportion of representation of the 7 borough members.
 
 
 18
 That equal representation is embraced in the Constitutional demand, epitomized as the rule of one-person-one-vote, is comprehensively expounded by Judge Sobeloff for this court in Ellis v. Mayor and City Council of Baltimore, 352 F.2d 123 (4 Cir. 1965). Importantly, the case's subject was fairness in drawing councilmanic election wards and the Constitutional criteria therefor. The opinion demonstrates, passim, that the 'true thrust' of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) and its kin-- WMCA, Inc. v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568; Maryland Committee, etc. v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595; Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609; Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620; and Lucas v. Forth-Fourth General Assembly of Colorado, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632-- is that "the fundamental principle of representative government in this country is one of equal representation for equal numbers of people, without regard to race, sex, economic status, or place of residence within a State." (Accent added.) 352 F.2d at 128. A city council was there analogized to a State legislature with the admonition that "seats in both houses * * * must be apportioned substantially on a population basis." Id. at 129. This distillation would only be watered down by further disquisition or by a rehearsal of the pat quotations the opinion takes from these precedents.
 
 
 19
 Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965), cited to sustain the validity of the instant plan, finds acceptable only half of the present design. No fault was found there in the choice of State senators in a multi-district county by a county-wide electorate, with the requirement that each senator be a resident of one of the districts. True, this scheme finds a parallel in the City of Virginia Beach's charter provision. But there the resemblance ends. In Fortson the Court significantly contracted its approval to the method of selection. It explicitly noted the absence of any substantial inequality among the districts. Had there been a vast disparity, such as Blackwater's 733 to Bayside's 29,048, it is not readily conceivable that the Court would have given its endorsement. In O'Shields et al. v. McNair et al., 354 F.Supp. 708 (D.S.C. 3-judge court, Feb. 28, 1966) Chief Judge Haynsworth of this court, writing the opinion, termed the substantial population equality of the districts in Fortson as 'crucial'. We agree.
 
 
 20
 Altogether unrealistic is the assumption that the member from the smaller populated political subdivision would give, or could humanly be expected to give, the far greater populated subdivisions representation equal to that he accords his residence constituency. Nor would his naturally dominating provincial interest be neutralized by his dependence upon the electorate of the entire city for his office. His subsequent defeat, because of a show of parochialism, would not remove the inequality in representation, for the choice of a successor would still be limited to the same district. The smaller area of population would thus continue to have representation equivalent to the much larger districts. This curtailment upon the selectivity of potential candidates is further proof of the vulnerability of the plan. Manifestly, the discussion in Fortson v. Dorsey, supra, 379 U.S. 433, 438, 85 S.Ct. 498 seemingly discounting the fear of sectionalism in a district's legislator was conditioned upon 'substantial equality of population' among the legislative districts there.
 
 
 21
 Moreover, confessedly, the Virginia Beach plan was purposed, and drafted with an eye, to include in the makeup of the council the representation of the peculiar interests of each borough. It was architectured to give voive to the agricultural or non-urban concerns of the smaller boroughs. However understandable, reasons of this kind may not be counted in appraising the Constitutionality of an apportionment. Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Ellis v. Mayor and City Council of Baltimore, supra, 352 F.2d 123, 128.
 
 
 22
 Unless enjoined, the 1966 apportionment will control in the next general election of councilmen, now scheduled by general statute for June 14, 1966. It governed in a primary election on April 5, 1966 for the nomination of candidates in the general election. Protestants of the plan ask us to enjoin its further employment, and to order that the June election be held on the basis of a selection of all 11 councilmen from the city at large. However, we think such decrees would be an unneeded disturbance of municipal affairs at this time.
 
 
 23
 Therefore, the election will be allowed to proceed without delay. The successful candidates will be permitted to organize and serve as the council of the City of Virginia Beach until the next session, whether special or regular, of the General Assembly of Virginia. If no reapportionment is then made of the councilmen, the District Court shall set aside the current apportionment and order an election of the councilmen at large or realign the boroughs so as to equalize substantially their populations.
 
 
 24
 Counsel fees will not be awarded the protestants, but the City of Virginia Beach will be ordered to pay the costs in the trial court and on appeal. This case will be remanded to the District Court with directions to retain jurisdiction and to proceed in accordance with the views herein expressed.
 
 
 25
 Reversed and remanded.
 
 
 
 [1]
 Davis et al. v. Dusch et al., (E.D.Va.), unreported opinions of 3-judge court dated Nov. 9, 1965 and of single judge dated Dec. 7, 1965
 
 
 [2]
 Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964); Ellis v. Mayor and City Council of Baltimore, 352 F.2d 123 (4 Cir. 1965)
 
 
 [3]
 Acts of General Assembly, 1966, ch. 39, p. 89, H.B. 101, approved Feb. 23, 1966