MONTGOMERY COUNTY COUNCIL, ET AL. *v.*
GARROTT, ET AL.

[No. 227, September Term, 1966 (Adv.).]

636

637

*Decided, per curiam, July 1, 1966.*

*Opinion filed August 4, 1966.*

*Concurring opinion filed August 23, 1966.*

The cause was argued before HAMMOND, HORNEY, MARBURY, OPPENHEIMER and BARNES, JJ.

*Charles R. Richey, Special Counsel,* with whom were *Robert G. Tobin, Jr., County Attorney for Montgomery County, Douglas H. Moore, Jr., Deputy County Attorney, Robert H. Metz* and *Charles G. Dalrymple, Assistant County Attorneys,* respectively, *for Montgomery County,* on the brief, for appellants.

*William A. Linthicum, Jr.,* and *David L. Cahoon* for Idamae Garrott and Rita C. Davidson, part of appellees. *Alfred L.*

*Scanlan,* with whom were *Charles A. Docter, Charles W. Gilchrist* and *Shea & Gardner* on the brief, for other appellees.

HAMMOND, J., delivered the opinion of the Court in which BARNES, J., concurs. Concurring opinion at p. 650, *infra.*

On July 1, 1966, the day of the advanced argument in this case, we filed a per curiam order affirming those parts of the decree of the Circuit Court for Montgomery County which had adjudged and ordered (1) that a resolution of the Montgomery County Council of June 14, 1966 (the resolution), which purported to amend the charter of the County (the Charter) to provide that the voters of each of seven councilmanic districts containing approximately an equal number of residents (established by the resolution) should elect one councilman to represent that district, was invalid and void; (2) that Art. I, § 1, of the Montgomery County Charter ("There shall be a County Council * * * of seven members as follows: One from each of the five * * * [council] districts * * * and two from the County at large" to be "nominated and elected by the qualified voters of the County * * *") was invalid (under the decisions of the Supreme Court establishing the principle that representative government requires equal representation for equal numbers of people, or the "one man, one vote" principle) because the Council districts had become so grossly disparate in population; (3) that the Montgomery County Council "rearrange and create councilmanic residence districts in accordance with the one-man, one-vote principle * * * and * * * submit the same to the registered voters of the County in the November, 1966 General Election all as provided in Sections 2-4 of the Montgomery County Code"; and (4) retained jurisdiction until "equitable apportionment is accomplished." We reversed that part of the decree of the Circuit Court requiring that the primary and general elections of 1966 be held "in accordance with the councilmanic residence district requirements of Article I, Section 1 of the Montgomery County Charter as heretofore in full force and effect and in accordance with the finding of this Court that County Council members shall be elected by all the voters of this County," and substituted our order that the primary and general elections of 1966 be held "so that

the members of the County Council of Montgomery County shall be nominated and elected at large without residence district requirements and * * * by the voters of Montgomery County as a whole."

Before spelling out the reasons for our actions, it is appropriate to notice the bases supporting judicial involvement in this normally political matter and the course of that involvement.

There remains little doubt that the one man, one vote principle, so fully articulated in *Reynolds v. Sims*, 377 U. S. 533, 12 L. Ed. 2d 506, is now applicable to political subdivisions of a state. A number of courts have so held. See, *e.g., Bianchi v. Griffing*, 238 F. Supp. 997, 1002 (E. D. N. Y. 1965), and cases cited, *appeal dismissed, Griffing v. Bianchi*, 382 U. S. 15, 15 L. Ed. 2d 11; *Ellis v. Mayor and City Council of Baltimore*, 234 F. Supp. 945 (D. Md. 1964), *aff'd*, 352 F. 2d 123. See also Weinstein, *The Effect of the Federal Reapportionment Decisions on Counties and Other Forms of Municipal Government*, 65 Colum. L. Rev. 21 (1965); *Reapportionment*, 79 Harv. L. Rev. 1228, 1269-72 (1966).

It was conceded below and in this Court that the requirements of Art. I, § 1, of the Charter of Montgomery County that each of five councilmen must come from the district of his residence, although elected by all the voters of the County, was presently unconstitutional because of the extreme variance in the population of the several districts.[1]

That a requirement of residence by a legislative representative in a district malapportioned as to population is unconsti-

---

1. The districts were established by the Charter in 1948. The growth and development of Montgomery County since then has resulted in a distribution of population in the five residency districts (according to the 1960 census figures) as follows:

| Council District | Population | % Distribution |
|---|---|---|
| 1 | 11,941 | 3 |
| 2 | 13,967 | 4 |
| 3 | 43,342 | 13 |
| 4 | 87,444 | 26 |
| 5 | 184,234 | 54 |
| TOTAL | 340,928 | 100% |

tutional, even though election be by all the voters of the political subdivision of which the district is a part, was foreshadowed by *Fortson v. Dorsey,* 379 U. S. 433, 13 L. Ed. 2d 401, which approved an apportionment in Georgia of fifty-four senatorial seats among fifty-four senatorial districts, thirty-three made up of from one to eight counties and twenty-one allotted in groups of from two to seven among the seven most populous counties, the election in such cases being on a county-wide basis, on the premise that the districts were equal in population. In *Davis v. Dusch,* 361 F. 2d 495, the Court of Appeals for the Fourth Circuit, speaking through Judge Bryan, upset a proposed apportionment plan for the City of Virginia Beach. The plan provided for eleven councilmen, all to be elected by the voters of the entire city. One of seven members was allotted to one of seven boroughs, of which he must be a resident. The remaining four members could reside anywhere within the corporate limits. The proposed boroughs ranged in population from 733 people to 29,048 people. The Court held that despite the provision that all councilmen were to be elected by the vote of all the voters of the city:

> "full compliance with the 14th Amendment's Equal Protection Clause * * * is still wanting. The principle of one-person-one-vote extends also to the level of representation, and exacts approximately equal representation of the people * * *. But that is not achieved in the 7-4 plan; the imbalance in representation in the council is obvious. * * * 'It is the distribution of * * * [members] rather than the method of distributing * * * [them] that must satisfy the demands of the Equal Protection Clause.' *Burns v. Richardson,* [348 U. S. 73, 16 L. Ed. 2d 376] * * *."

On June 3, 1966, a bill for declaratory and injunctive relief was filed in the Circuit Court for Montgomery County by one Zelenka against the Board of Supervisors of Election seeking (a) to have at large elections for council members declared invalid, and (b) revision of councilmanic districts to coincide with the legislative districts created by Ch. 531 of the Laws of 1966. On June 14 the Montgomery County Committee for Fair

Representation and five residents of the County intervened in the Zelenka suit and filed pleadings which sought to dismiss Zelenka's bill and to have at large elections declared mandatory.

On the same day, June 14, the County Council, spurred on by the suits and by the decision in *Davis v. Dusch, supra,* sought to amend the Charter by passing the resolution which purported to rearrange the councilmanic districts to make them about equal population-wise and, in the process, to provide that the resident member from each district should be elected by the voters of that district.

On June 15 two candidates for the Council filed a bill for declaratory relief in which they alleged the passage of the resolution and that they had been advised by the Supervisors of Election that those officials intended to conduct both the primary and general elections in accordance with the resolution and that the resolution is invalid under the Constitution and laws of Maryland and the Charter of Montgomery County, and prayed for a decree (a) declaring the resolution to be illegal and void, and (b) enjoining the supervisors from conducting an election under the resolution. The Circuit Court heard the cases together and issued its decree, referred to in the beginning of this opinion and now under review, applicable to both cases.

We pass to the reasons which prompted us to agree with the Circuit Court that the resolution must be rejected as invalid and to disagree with its view that the primary and general elections should be held under the invalid five-two plan provided for in Art. I, § 1, of the Charter.

Section 3 of Art. II of the Charter vests in the County Council "the law-making power [of the County] * * *, including all law-making powers heretofore exercised by the General Assembly of Maryland but transferred to the People of the County by virtue of the adoption of this Charter * * *." It also provides that "for the enactment of legislation the County Council shall sit in Legislative Session during May of each year." Section 4 b of Art. II gives the Council power to enact laws necessary to provide for the nomination and election of members

of the County Council "in such manner as may be legally permitted under the law of Maryland."

Section 4 of Art. III ("The Executive Branch") provides that "to guard against hasty legislation and afford the people of the County adequate opportunity to express their will," no bill is to become law "until the 15th day of August following the close of the Legislative Session" and that any person shall have the right to appear before the Council and state why the bill should not become law. The section goes on: "* * * the County Council * * * shall have the right as the chief executive authority of the County by the affirmative vote of four members to veto a bill and if vetoed the bill shall not become law. If not vetoed, a bill shall become law on said 15th day of August * * * unless the bill is subjected to a valid referendum under this Charter."

Section 5 b of Art. VIII provides that the Charter may be amended in the manner provided in § 5 of Art. XI-A of the Constitution of Maryland. One manner so provided is a resolution of the Council submitting the proposed change to the voters "at the next general or congressional election occurring after the passage of said resolution * * *." Subsection c of § 5 of Art. VIII of the Charter provides: "The County Council in *legislative session* shall have power to enact local laws to facilitate the repeal or amendment of this Charter by vote of the electors of the county." (Emphasis supplied.)

Whether the Council really thought it, like the Legislature of the State, generally had plenary powers, except as limited by constitutional provisions (*cf. Md. Committee v. Tawes,* 228 Md. 412, 439), or whether it really thought that because the existing councilmanic districts were constitutionally intolerable, the unconstitutionality bestowed inherent powers upon it and it did not matter how the imbalance was cured, or whether it combined the two thoughts, we do not know. It is clear, however, that the Council is a political creature of delegated powers, that it can effectively act only within the limits of the powers delegated to it by the Constitution and the Legislature, *Ames v. Supervisors of Elections,* 195 Md. 543, 551, and that it did not respect the limits and bounds imposed on it when it failed to act in legislative session and evaded both the Au-

gust 15th effective-date provision and the submission of the proposed changes to the voters of the County at the next general election.

If it be assumed, without deciding, that some of these limits and bounds need not, under the circumstances, have been strictly respected, it is further apparent that it was substantively beyond the power of the Council to provide for the election of councilmen by other than a county-wide vote and that, therefore, it did not provide for the nomination and election of members of the County Council "in such manner as may be legally permitted under the law of Maryland" under § 4 b of Art. II of the Charter. Section 1 of Art. VII of the Constitution of Maryland provides: "County Commissioners shall be elected on general ticket of each county by the qualified voters of the several counties of the State * * *." The phrase "on general ticket" if its meaning were not made apparent by the following requirement of the Constitution that the election be by the qualified voters of the county is clearly defined by its historical background and its commonly agreed-upon interpretation. The Constitution of Maryland of 1851 provided its own definition in § 8 of Art. VII that the then newly designated county commissioners "shall be elected by general ticket, and not by districts, by the voters of the several counties * * *." Judge Niles in Maryland Constitutional Law 304 says that the reason for providing for the election of county commissioners upon a "general ticket" is to prevent "any apportionment between smaller localities, such as assigning one or more to certain election districts."

Attorney General O'Conor in 20 Op. A. G. 357, 360 (as did Attorney General Finan in an opinion dated February 28, 1966), concluded that election by general ticket historically has meant election by all the qualified voters of the county. Volume IV, Pt. II of The Oxford Dictionary: A New English Dictionary on Historical Principles—new in 1901, the year of its publication—has this definition: *"General Ticket* (U. S.): the system by which the whole list of candidates for the representation, *e.g.* of a state or city, is voted upon by the undivided body of electors * * *." The Supreme Court of Michigan found the same meaning in the phrase "general ticket" in *Maynard v. Board of District Canvassers,* 47 N. W. 756, 760.

Section 3 of Art. XI-A of the Constitution, "Local Legislation [for chartered counties]" provides:

"Every charter [authorized by this Article] * * * shall provide for an elective legislative body in which shall be vested the law-making power of said City or County. * * * The chief executive officer, if any such charter shall provide for the election of such executive officer, or the presiding officer of said legislative body, if such charter shall not provide for the election of a chief executive officer, shall be known * * * in any County as the President of the County Council of the County, and all references in the Constitution and laws of this State * * * to the County Commissioners of the Counties, shall be constructed [construed] to refer to * * * the President and County Council herein provided for whenever such construction would be reasonable." [2]

The Express Powers Act, Code (1957), Art. 25A (passed in 1918 by the Legislature pursuant to the direction of § 2 of Art. XI-A of the Constitution that at its first session after the adoption of Art. XI-A it provide "a grant of express powers for such County or Counties as may thereafter form a charter under the provisions of this Article"—a grant which, under § 4 of Art. XI-A, cannot be changed by public local law), provides in § 2 that:

"The members of the county council of any county adopting a charter under said Article XIA shall be elected on the general ticket by the qualified voters of such county as the members of the General Assembly are or may be elected under the provisions of

---

2. Section 4 b of Art. IX of the Charter provides: "In accordance with the provisions of Article XIA of the Maryland Constitution at such time as the elected members of the first County Council take office, all references in the constitution and laws of Maryland to the county commissioners shall be construed in the case of Montgomery County to refer to the County Council which shall at such time succeed to the powers of the county commissioners for Montgomery County."

the law of the State of Maryland, and members of the county council shall be likewise nominated as members of the General Assembly are or may be nominated under provisions of the law of the State of Maryland,"

and § 3 permits a charter to require that a specified number of councilmen must reside in specified districts in the county, with the proviso that:

"nothing herein contained shall be construed to affect the requirement of § 2 hereof that the members of the county council shall be nominated as members of the General Assembly are or may be nominated under the provisions of the law of the State of Maryland, and that such members shall likewise be elected on the general ticket by the qualified voters of such county as members of the General Assembly are or may be elected under the provisions of the law of the State of Maryland."

We find it clear that the directions of § 1 of Art. VII of the Constitution that County Commissioners must be elected by general ticket, that is, by all the qualified voters of the county, is made applicable to councilmen of Montgomery County by virtue of § 3 of Art. XI-A of the Constitution and that the provisions of § 1 of Art. I of the Charter that councilmen "shall be nominated and elected by the qualified voters of the County" was a necessary reflection of this transplanted requirement.

The appellants begged us to take the view that the words of § 2 of Art. 25A (that the councilmen are to be nominated and elected as the members of the General Assembly are) and the words of the proviso in § 3 (that nothing in the statutes' provision for a charter to impose residence districts for councilmen is to be construed "to affect the requirement of § 2 hereof") make mandatory election of councilmen by districts. They argue that inasmuch as the reapportionment of the State Legislature under Ch. 2 of the Special Session of 1965 and Ch. 531 of the Laws of 1966 is accomplished by the election of delegates and senators resident in a legislative district by the

voters of the district, and § 2 and § 3 of Art. 25A direct that councilmen shall be nominated and elected "as the members of the General Assembly are," the inevitable result must be that councilmen now are to be elected from districts in which they respectively live. There are several compelling reasons why this argument cannot prevail. Section 1 of Art. VII of the Constitution, as we read it, flatly and compellingly says that county councilmen shall be elected by the qualified voters of the entire County and so forbids election by districts. At the times § 2 and the proviso in § 3 of Art. 25A became law, members of the Legislature were elected county-wide so that the constitutional requirement for county-wide voting for councilmen and the statutory requirement of equivalence between election of councilmen and that of members of the Legislature were entirely harmonious. Now that the Constitution still requires county-wide voting for councilmen but the Legislature is to be elected district-wide, §§ 2 and 3 of Art. 25A should be read, if possible, so as to give effect to their words without putting them in conflict with the constitutional provision. As the Circuit Court pointed out, the equating of the nomination and election of councilmen with the nomination and election of members of the Legislature could be related only to the procedural and mechanical aspects of those processes such as dates of filing, filing fees, primary requirements, party designations, and dates of election. So read, there would be no conflict with § 1 of Art. VII of the Constitution. The legislatures that passed '§ 2 and the proviso of § 3 of Art. 25A must be presumed to have known that § 1 of Art. VII of the Constitution demanded county-wide voting for council members, and that they could not change this demand by statute. Therefore, they must be deemed to have intended by passing §§ 2 and 3 of Art. 25A to have referred to matters they could control by statute, such as the mechanical and procedural aspects of nomination and election of councilmen. This view is strengthened by reflection that some legislative districts now are composed of several counties and by consideration of the whole of § 3, which expressly permits a charter to impose residence requirements in the election of council members and at the same time says this shall not destroy the sameness of the nomination and election of

councilmen and members of the Legislature. When § 3, as it now reads, was enacted in 1955 (Ch. 556), a candidate for the Legislature was not required to live in a district. Clearly, the Legislature did not contemplate that the identity of nominative and elective requirements extended to all aspects of those matters. We are of the firm opinion that the County Council cannot bring about a charter requirement that election of council members be by the voters of a district as long as § 1 of Art. VII and § 3 of Art. XI-A of the Constitution stand as they now read.

We think the Circuit Court was not justified in allowing the primary and general elections of 1966 to be conducted in accordance with the invalid residence districts established by § 1 of Art. I of the Charter. The Supreme Court said in *Reynolds v. Sims,* 377 U. S. 533, 585, 12 L. Ed. 2d 506, 541:

> "It is enough to say now that, once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. * * * In awarding or withholding immediate effective relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles."

In *Swann v. Adams,* 383 U. S. 210, 15 L. Ed. 2d 707, the Supreme Court put this philosophy into action, reversing the District Court which had permitted an admittedly unconstitutional apportionment plan to remain in effect on an interim basis so that the 1966 elections would be conducted under it. The Supreme Court found no warrant for perpetuating an unconstitutional apportionment for one more election and remanded the case so that a valid plan would be made effective for the 1966 election. There would seem to be no procedural or mechanical difficulties in holding the 1966 elections in Montgomery County on an at large basis and no substantive reason why an at large election would not gratify the one-man, one-vote principle established by the Supreme Court.

At large voting has hitherto been approved by the Supreme Court in necessary circumstances. See *Smiley v. Holm,* 285 U. S. 355, 76 L. Ed. 795; *Koenig v. Flynn,* 285 U. S. 375, 76 L. Ed. 805; *Carroll v. Becker,* 285 U. S. 380, 76 L. Ed. 807. In *Scott v. Germano,* 381 U. S. 407, 14 L. Ed. 2d 477 (1965), the Court remanded the Illinois reapportionment case to the District Court with directions to retain jurisdiction and if a valid plan were not timely effected to enter an order for "a valid reapportionment plan for the State Senate or an order directing *that its members be elected at large* pending a valid reapportionment by the State itself." (Emphasis supplied.) Lower courts have agreed that an at large election is valid. *Germano v. Kerner,* 241 F. Supp. 715 (N.D.Ill.), order vacated on other grounds in *Scott v. Germano,* 381 U. S. 407; *Reed v. Mann,* 237 F. Supp. 22 (N.D.Ga.); *Moore v. Moore,* 229 F. Supp. 435 (S.D.Ala.); *Swanson v. State of Illinois,* 226 F. Supp. 699 (N.D.Ill.); *Brown v. Saunders* (Va.), 166 S. E. 105. See also *Davis v. Dusch, supra,* and McKay, *Political Thickets and Crazy Quilts: Reapportionment and Equal Protection,* 61 Mich. L. Rev. 645, 701-05.

The appellants say that 53% of the population of Montgomery County is concentrated in 14% of the land area (500 square miles) of Montgomery County (apparently the Wheaton, Silver Spring and Colesville areas) and draw the conclusion entirely without support in the record that the practical effect of this crowding "is the total disenfranchisement of approximately 200,000 residents, and the absolute denial to them of any voice in their local government." This conclusion would seem to overlook the fact that every voter's vote would have a weight equal to that of every other voter in the at large selection of each councilman, but an even shorter answer is that there was no proof or showing that county-wide voting, without residence requirement, would produce an unconstitutional result, and the Supreme Court has said and held that there must be a demonstration in the record before a facially constitutional plan of representation will be upset as unconstitutional in practice and effect. In *Fortson* the Court gave its blessing, as facially valid, to a plan for county-wide voting for state senators in counties having multi-residence districts and in answer to the bald, un-

supported assertion that the county-wide election method had been resorted to by Georgia in order to minimize the strength of racial and political minorities in the populous urban counties, said at page 439 of 379 U.S.:

> "It might well be that, designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population. When this has been demonstrated, it will be time enough to consider whether the system still passes constitutional muster. This question, however, is not presented by the record before us."

Similarly, the questions posed by the appellants as to the effect of at large voting is not presented by the record in this case.

The Supreme Court has made other similar rulings. In *Burnette v. Davis*, 382 U. S. 42, 15 L. Ed. 2d 35, the Court affirmed per curiam a three-judge District Court decision—*Mann v. Davis*, 245 F. Supp. 241 (E. D. Va.)—that a multi-member district combining Richmond and Henrico County in Virginia was constitutional despite claims of discrimination based on figures which showed that Negroes constituted 42% of the city population but only 29% of the combined district population. Judge Bryan for the Court below pointed out that councilmen for the local government of Richmond had been traditionally elected at large "without question by either race," and said (p. 245 of 245 F. Supp.):

> "The concept of 'one person, one vote', we understand, neither connotes nor envisages representation according to color. Certainly it does not demand an alignment of districts to assure success at the polls of any race."

The labels "political parties," "factions," "conservatives" or "liberals" could be validly substituted for "race" in the quotation. See also *Wright v. Rockefeller*, 376 U. S. 52, 11 L. Ed. 2d 512, and *Burns v. Richardson*, 384 U. S. 73, 88-89, 16 L. Ed. 2d 376, 389, where the Court, in approving an apportion-

ment plan against claims that the legislature in establishing the districts failed to take into account "community of interests, community of problems, socio-economic status, [and] political and racial factors," said:

> "But the demonstration that a particular multi-member scheme effects an invidious result must appear from evidence in the record. * * * That demonstration was not made here. * * * Speculations do not supply evidence that the multi-member districting was designed to have or had the invidious effect necessary to a judgment of the unconstitutionality of the districting."

The rationale of this language is, in our view, equally applicable to the fears of the appellants as to the effect of an election at large without residence requirements in Montgomery County.

BARNES, J., filed the following opinion, concurring in the result.

I concur in the result in this case because I recognize—as I must—that the Supreme Court of the United States in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed. 663 (1962) and in subsequent cases, including *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) has, contrary to its previous decisions, held that alleged malapportionment of seats in the houses of a state legislature on a population basis presents a justiciable issue in the courts under the equal protection clause of the Fourteenth Amendment, and further that if there is representation in those houses by districts, representation must be based upon a substantially equal arithmetical division of population. This latter dogma is the so-called "one man, one vote" principle—a designation I think unfortunate and rather deceptive as I will point out later. I pointed out in my dissenting opinion in *Hughes v. Maryland Comm. for Fair Representation*, 241 Md. 471, 491, 217 A. 2d 273, 285 (1966) the reasons why I think the decisions in *Baker v. Carr* and subsequent cases following it, were erroneous and fraught with grave danger to the foundations of our federal republic. These reasons were brilliantly and, to my mind, completely articulated in the

dissenting opinions of Mr. Justice Frankfurter and Mr. Justice Harlan in *Baker*. They need not be repeated here.

The dilemma presented to a judge of the highest appellate court of a State arises from his oath to support and defend *both* the Constitution of the United States and the Constitution of his State. In view of the supremacy clause of the Constitution of the United States, it is clear that when the *provisions of that document* conflict with the provisions of the Constitution of a State, the former must control and further that the interpretation of the meaning of the provisions of the Constitution of the United States by the Supreme Court must be given effect by the judges of the State courts upon the principle of *stare decisis*—a principle of the essence of the judicial process. When, however, the Supreme Court itself in the first case construing a provision of the United States Constitution and in a number of decisions applying the principle established by that first case, has *held* that a provision of the United States Constitution does not apply to the States or does not present a justiciable issue because political in nature, and with a due regard for the provisions of the Ninth and Tenth Amendments, does the doctrine of *stare decisis* properly apply to decisions of the Supreme Court in which a bare majority of that Court, itself, declines to follow the doctrine of *stare decisis?* [1] I have reluctantly reached the conclusion that we are not free to refuse to apply the doctrine of *stare decisis* even though the Supreme Court has departed from that doctrine. The remedy lies with the people and their

---

1. The case of Maryland Committee v. Tawes, 228 Md. 412, 180 A.2d 656 (1962) presented an aspect of this problem, as a *specific provision* of the Maryland Constitution in regard to the allocation of delegates and senators among the political subdivisions of the State, was challenged as being inconsistent with the equal protection clause of the Fourteenth Amendment of the United States Constitution as recently interpreted by the Supreme Court—contrary to the prior decisions of that Court. The majority of the Court of Appeals determined that it had the power and the duty to declare a specific provision of the Maryland Constitution unconstitutional under these circumstances. The dissenting opinion by Judge Henderson, concurred in by Judge Horney, were of the opinion that this could not be done. See 228 Md. at 441, 180 A.2d at 672. In my opinion the dissenting opinion presented the proper application of the law.

representatives in Congress and not with us. This conclusion is a heavy burden and painful yoke which must be borne, but it need not be borne willingly and with silent submission. Indeed, as I have already indicated in my concurring opinion in the recent case of *Truitt v. Board of Public Works*, 243 Md. 375, 411, 221 A. 2d 370, 392 (1966), I believe it to be the *duty* of appellate judges of the several States to point out, in all cases where relevant, their opinion of the errors of the Supreme Court and the unfortunate effects of these errors. In no case should these errors be extended by the State courts.

Mr. Justice Frankfurter in his dissent in *Baker*, clearly pointed out that by its decision in that case, the majority of the Supreme Court would cause the judiciary to enter a "political thicket." His prophesy has come to pass, with unfortunate results to State-Federal relationships and with grave danger to the judicial branches of both the State and Federal Governments. The policy in Maryland for many years has been to separate the Courts from politics and, on the whole, the effort has been successful. It is a step backward, in my opinion, to plunge the Courts into the most political situation of all—the determination of the nature and extent of districts for representation in the legislative branch of government. The doctrine of the separation of powers between the legislative, executive and judicial branches of government—a most important protection for the freedom of the citizen—clearly indicates to me that Courts should not attempt to adjudicate in this essentially legislative and political area. Mr. Justice Frankfurter said in his dissenting opinion in *Baker v. Carr*:

> "The Court today reverses a uniform course of decision established by a dozen cases, including one by which the very claim now sustained was unanimously rejected only five years ago. The impressive body of rulings thus cast aside reflected the equally uniform course of our political history regarding the relationship between population and legislative representation—a wholly different matter from denial of the franchise to individuals because of race, color, religion or sex. Such a massive repudiation of the experience of our whole past in asserting destructively novel judicial

power demands a detailed analysis of the role of this Court in our constitutional scheme. Disregard of inherent limits in the effective exercise of the Court's 'judicial Power' not only presages the futility of judicial intervention in the essentially political conflict of forces by which the relation between population and representation has time out of mind been and now is determined. It may well impair the Court's position as the ultimate organ of 'the supreme Law of the Land' in that vast range of legal problems, often strongly entangled in popular feeling, on which this Court must pronounce. The Court's authority—possessed of neither the purse nor the sword—ultimately rests on sustained public confidence in its moral sanction. Such feeling must be nourished by the Court's complete detachment, in fact and in appearance, from political entanglements and by abstention from injecting itself into the clash of political forces in political settlements." (Pages 266-267 of 369 U.S.).

A proper humility should lead the majority of the Supreme Court to return to the more orthodox constitutional doctrines of their predecessors, and failing that, should lead the peoples' representatives in the legislative branch to take appropriate steps to remove what is to my mind, an unwarranted interference with the legislative power.

The situation is aggravated by the insistence by the majority of the Supreme Court in imposing one of several theories of representative government upon the legislative branch, namely, that of arithmetical equality of population when representation is based on districts. There are many other well recognized and previously practiced theories of representative government among the several States, in the government of the United States, itself, and in England. Mr. Justice Frankfurter in his dissent in *Baker v. Carr*, reviews the application of these theories in pages 301 to 324 of 369 U. S. and they need not be reviewed here. Mr. Justice Frankfurter summarized the matter as follows:

"The notion that representation proportioned to the geographic spread of population is so universally ac-

cepted as a necessary element of equality between man and man that it must be taken to be the standard of a political equality preserved by the Fourteenth Amendment—that it is, in appellants' words 'the basic principle of representative government'—is, to put it bluntly, not true. However desirable and however desired by some among the great political thinkers and framers of our government, it has never been generally practiced, today or in the past. It was not the English system, it was not the colonial system, it was not the system chosen for the national government by the Constitution, it was not the system exclusively or even predominantly practiced by the States at the time of adoption of the Fourteenth Amendment, it is not predominantly practiced by the States today." (Page 301 of 369 U.S.).

The mere counting of heads in districts from time to time regardless of the number or qualifications of electors, the social, economic and other factors involved, appears to many to be the *least desirable,* the *most arbitrary* and the *most inconvenient* of all of the theories of representative government, yet it has become—temporarily one hopes—a rigid principle of federal constitutional law applicable to all fifty States. This destroys one of the great advantages of our federal system, i.e., the ability of the several States to experiment with the various theories of representative government with the hope that as a result of experience, the best system of such government will finally be demonstrated by experience and adopted by the people of the States as and when they decide to adopt it for their particular State. As Mr. Justice Stewart aptly stated in his dissenting opinion in *Lucas v. Colorado General Assembly,* 377 U.S. 713, 748-749, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964) :

"What the Court has done is to convert a particular political philosophy into a constitutional rule, binding upon each of the 50 States, from Maine to Hawaii, from Alaska to Texas, without regard and without respect for the many individualized and differentiated characteristics of each State, characteris-

tics stemming from each State's distinct history, distinct geography, distinct distribution of population, and distinct political heritage. My own understanding of the various theories of representative government is that no one theory has ever commanded unanimous assent among political scientists, historians, or others who have considered the problem. But even if it were thought that the rule announced today by the Court is, as a matter of political theory, the most desirable general rule which can be devised as a basis for the make-up of the representative assembly of a typical State, I could not join in the fabrication of a constitutional mandate which imports and forever freezes one theory of political thought into our Constitution, and forever denies to every State any opportunity for enlightened and progressive innovation in the design of its democratic institutions, so as to accommodate within a system of representative government the interests and aspirations of diverse groups of people, without subjecting any group or class to absolute domination by a geographically concentrated or highly organized majority."

Then too, the elimination of the protection of minorities who reside in sparsely settled areas will inevitably lead to political discontent resulting from the silencing of voices which should be heard in the legislative halls. The silencing and political suppression of minorities by a strict application of the head-counting process is not, in my opinion, the best way to secure the individual liberties of the citizen which the American constitutional system was designed to promote. It is somewhat odd that the arithmetically equal population system should have been the one selected by the present majority of the Supreme Court for imposition upon the States.

This curious system is now quite generally called the "one man, one vote" principle. I think this title is a misnomer as it rather obscures the real nature of the principle, which might more accurately be called the "arithmetically equal population" principle. I am not acquainted with any system of representative government in which *every* man necessarily has one vote

or in which a man otherwise entitled to vote has *more* than one vote or a *fraction* of one vote. Then too, *women* vote and may not be deprived of their suffrage by reason of their sex by virtue of the Nineteenth Amendment to the United States Constitution.[2]

I agree fully with the statement of Mr. Justice Harlan in his dissenting opinion in *Reynolds v. Sims:*

> "* * * I think it demonstrable that the Fourteenth Amendment does not impose this political tenet on the States or authorize the Court to do so." 377 U. S. at 590, 84 S. Ct. at 1396, 12 L. Ed. 2d at 544.

I concede that if the decisions in *Baker v. Carr* and *Reynolds v. Sims* are to be applied—as unhappily they must be— the opinion of the Court logically and properly applies those decisions in the case at bar. I, therefore, concur in the result.

---

2. The "one man, one vote" designation is apparently an adaptation of the statement in the opinion of Mr. Justice Douglas in Gray v. Saunders, 372 U.S. 368, 381, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) in which he indicated that the equal protection clause required "one *person,* one vote" (emphasis supplied). Mr. Justice Clark in his concurring opinion in Reynolds v. Sims, supra, refers to it as the "equal population" principle, which, to my mind, is a more accurate designation of the principle than that stated by Mr. Justice Douglas. As I have indicated, I prefer the designation as the "arithmetically equal population" principle.