RENEE DuBOIS et al. *v.* CITY OF COLLEGE
PARK et al.

[No. 139, September Term, 1978.]

*Decided January 28, 1980.*

678

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

*Kenneth A. Lechter* for appellants.

*Morris Topf* and *Richard C. Daniels,* with whom were *Reichelt, Nussbaum, Brown & Topf* on the brief, for appellees.

ELDRIDGE, J., delivered the opinion of the Court.

The largest campus of the University of Maryland is located in the City of College Park in Prince George's County, Maryland. Pursuant to a court order to reapportion its councilmanic districts, the City of College Park adopted a revised apportionment plan that excluded from its population apportionment base a large segment of students who lived in the University's dormitories. The issue before us is whether the exclusion of these students, under the circumstances of this case, violated the equal protection of the laws, and particularly the "one person one vote" principle of *Baker v. Carr,* 369 U.S. 186, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962);

*Reynolds v. Sims,* 377 U.S. 533, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964), and their progeny.

The City of College Park is divided into eight councilmanic districts, each of which elects one councilman to the City Council. The College Park campus of the University of Maryland is largely contained in parts of the third and fifth districts — often referred to as the "student" districts. All dormitories are within the third and fifth districts. On the other hand, some fraternity and sorority houses, in which students also reside, are located in the second district.

In connection with its apportionment plan adopted in 1967, the City of College Park had to determine a population apportionment base, from which would be calculated the equal number of persons that would be included in each of its eight districts. The City arrived at its apportionment base by subtracting from its total federal census population, which included all students physically residing in the City of College Park, those students who physically resided in dormitory facilities at the University.[1]

After the 1970 federal census was conducted, the City established a reapportionment committee. Although the reapportionment committee developed several different

---

1. Although all parties consistently refer to the excluded students as "on-campus" students and other students as "off-campus" students, it is not entirely clear what was meant by those terms. It appears that the phrase "on-campus" students refers to those students who live in dormitory facilities situated on property located within the actual physical boundaries of the University. All "on-campus" students would therefore be in the third and fifth districts. It is not completely clear whether the term "on-campus" also includes those residing in fraternities or sororities in the third district. The term "off-campus" students appears to refer to students who live in private residences or apartments, presumably including private residences in the third and fifth districts, and not on property physically located within the University's boundaries. In addition, all students living outside of the third and fifth districts are considered "off-campus" students. Thus, a student living in one of the fraternity or sorority houses located in the second district would be deemed an "off-campus" student, just as if he lived in private housing.

For the purposes of this opinion, we will accept what appears to be the parties' definitions of these terms. Therefore, "on-campus" students will refer to students who live in University residence facilities located within the boundaries of the University, which places those students in the third or fifth district. "Off-campus" students will refer to students who live in all other districts within the City, including those who live in fraternities and sororities in the second district.

reapportionment plans, none was adopted by the City, and it continued to use the apportionment plan of 1967.

In October 1975, three students began the instant proceedings by filing a class action in the Circuit Court for Prince George's County, alleging that the 1970 census showed the councilmanic districts to be unequally apportioned. The plaintiffs claimed that as a result of this malapportionment, the votes of the plaintiff class were unconstitutionally diluted. The named plaintiffs, Renee DuBois, David Johnson and Zachary Kinney, were alleged to be students at the University of Maryland, residents of the City of College Park, and registered to vote in City elections. One of the plaintiffs lived in a dormitory in the fifth district, one lived in a fraternity house in the third district, and one lived in a sorority house in the second district. The class represented by the named plaintiffs was defined as those students at the University of Maryland who were residents of the City of College Park and qualified to vote in all City elections.

As developed at trial, the basis of the plaintiffs' claim was that on-campus students were excluded from the apportionment figure which was used to determine the size of each councilmanic district of the City. As a result, according to the plaintiffs, their individual votes were diluted because the two councilmanic districts that include the University of Maryland campus contained two or three times the population of the other six districts.

According to the evidence produced at the trial, the total population of College Park, as determined by the 1970 federal census, was 26,156, which included the students who lived within the University's physical boundaries within the third and fifth districts, as well as students who lived elsewhere within the City. However, after interpolating the 1970 census figures into the eight districts as they were constituted under the 1967 apportionment plan, the City calculated that its new apportionment base would only be 17,517. Consistent with the method that it employed with the 1967 plan, the new apportionment base was arrived at by excluding from the 1970 census total population the approximately 8,000

students, as determined by numbers supplied by University of Maryland officials, who resided in dormitories within the physical boundaries of the University.[2] The Mayor stated, however, that the apportionment base of 17,517 included all students who resided in districts other than the third and fifth, and this fact was reiterated by counsel for the City at a hearing before the circuit court.

Based upon the 17,517 population figure, a perfectly apportioned plan would have had 2,190 persons in each district. All parties agreed, however, that if the students who resided within the physical limits of the University should have been included in the apportionment base, then the City's districts, even if changed to reflect 1970 population figures, would be malapportioned. If the 3,812 students living in University residence facilities in the third district and the 4,635 students living in University residences in the fifth district were added to the population already included in these districts under the 1967 plan, as adjusted for the 1970 census, then the total population within these districts would be 5,843 and 6,906 respectively. These figures are far in excess of the 2,190 persons who would be in each of the other districts.

At the close of the trial, the circuit court concluded that none of the named plaintiffs was domiciled in College Park. Therefore, the court held that the named plaintiffs lacked standing to maintain the action. In addition, because the named plaintiffs were not deemed domiciliaries of the City, they were held to be outside of the class which they purported to represent. The circuit court dismissed the action for lack of standing.

2. It is unclear whether this 8,000 student figure included students who resided in fraternity or sorority houses located in the third district, or whether it included students who resided in private residences in the third and fifth districts. It is clear that the 8,000 figure did not embrace any students who resided in districts other than the third or fifth districts. Therefore, the 8,000 figure did not include those students who resided in the fraternity and sorority houses in the second district.

There is, however, some indication in the record that the 8,000 figure included only students who resided in the dormitories, which are located only in the third and fifth districts. Thus, there is an inference that students who lived in the fraternities and sororities in the third district and private residences in the third and fifth districts were not included in the 8,000 figure and that, therefore, these students were included by the City in the population base for the third and fifth districts.

The plaintiffs appealed to the Court of Special Appeals, and this Court issued a writ of certiorari prior to a decision by the intermediate appellate court. We held that the plaintiffs, as registered voters of the City of College Park, had standing to maintain a suit challenging the City's apportionment. *DuBois v. City of College Park,* 280 Md. 525, 375 A.2d 1098 (1977). Further, we stated that the City, by moving to dismiss for lack of standing, could not collaterally challenge whether the plaintiffs were properly registered as voters. Instead, we held that any challenge by the City to the plaintiffs' status as registered voters must be made through the procedures prescribed by statute and the City charter for making such challenges. 280 Md. at 529, 533-534. The case was remanded to the circuit court.

After further arguments were held, the circuit court found that, in light of the 1970 census, the deviation between the actual population in each district and the number of persons who would constitute a properly apportioned district, was too large. The court, however, rejected the plaintiffs' claim that all on-campus students should also be included in the City's apportionment base. The circuit court reasoned that, according to the principles set forth by this Court in *Bainum v. Kalen,* 272 Md. 490, 325 A.2d 392 (1974), an on-campus student was presumed to be a domiciliary of his former place of residence. The court stated that a student could overcome this presumption by registering to vote in College Park, at which time the student must affirm by oath that he intended to remain a City domiciliary. Therefore, the court held that equal protection principles did not require the inclusion of all on-campus students in the apportionment base because this would encompass transient nonresidents. The court further held that, because some of the students who resided within the University's boundaries had overcome the presumption of nonresidency by registering to vote in the City, the City was required to include in its apportionment base any student in the third or fifth district who had registered to vote. Moreover, the court noted that this inclusion of students who resided in the third and fifth districts, and who had registered to vote, would further increase the existing

malapportionment in light of the 1970 census. The court then ordered the City to submit a new apportionment plan, consistent with its opinion, correcting the existing malapportionment.

The City subsequently submitted a revised apportionment plan which, all parties agreed, conformed to the court's order. A final judgment approving the new plan was entered. The plaintiffs again appealed, and this Court again issued a writ of certiorari prior to a decision by the Court of Special Appeals.

The primary issue on this appeal is whether the approved apportionment plan, which in six districts included all students in the population base, and in two districts apparently included all off-campus students but only those on-campus students who had registered to vote, violates equal protection of the laws.[3] The plaintiffs contend that the circuit court erred in holding that the City only had to include those on-campus students who had registered to vote instead of the

---

3. The City also has raised two arguments in a motion to dismiss this appeal. First, it asserts that the plaintiffs failed in the trial court to present sufficient evidence in support of their contention that the revised apportionment plan is unconstitutional. Second, the City argues that the plaintiffs did not exhaust their administrative remedies because they did not oppose the new plan at a public hearing conducted as part of the City Council's adoption of the plan.

Preliminarily, we note that this case is properly within this Court's jurisdiction, and there are no violations of procedural requirements alleged that would warrant dismissal of the appeal. The two grounds urged by the City, even if meritorious, would not be grounds for dismissal. Of course, an appellate court can *affirm* a decision of a trial court on any ground adequately shown by the record, even if it was not the ground relied on by the trial court, and even if it was not raised by the parties in the trial court. Robeson v. State, 285 Md. 498, 502, 403 A.2d 1221 (1979). If the record were insufficient to show the invalidity of the apportionment plan, or if there were administrative remedies which should have been exhausted, these might be grounds for an affirmance.

Nevertheless, in this case, both contentions by the City must fall on their merits. The evidence at the first trial, coupled with the type of new plan mandated by the circuit court's order and the representations of the City's counsel at the hearing on the new plan, were sufficient to present the equal protection issue raised by the plaintiffs.

With respect to the plaintiffs' asserted failure to exhaust their administrative remedies, the action of the City Council in adopting the revised plan was a legislative action and not a determination by an administrative agency. We are not aware of any principle of law stating that one affected by a legislative enactment may not challenge the validity of that enactment unless he had been present and testified at the legislative hearings.

entire on-campus student population. They argue that the inclusion of all off-campus students in the apportionment base whether or not they are registered to vote, while requiring that on-campus students must register to vote in order to be included, creates an arbitrary classification.

The general principle governing legislative apportionment is that there "must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen." *Reynolds v. Sims, supra,* 377 U.S. at 579. *See also St. Adm. Bd. of Elect. Laws v. Calvert,* 272 Md. 659, 327 A.2d 290 (1974), *cert. denied,* 419 U.S. 1110, 95 S. Ct. 784, 42 L. Ed. 2d 807 (1975).[4] Some differentiation among citizens with respect to the weight of their vote may be permissible if it related to "permissible purposes of legislative apportionment" or effected "a rational state policy," 377 U.S. at 565, 579. Nevertheless,

"if, even as a result of a clearly rational state policy ... population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all of the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired." (*Id.* at 581.)

Moreover, in deciding reapportionment cases like the present one, classifications having the effect of diluting a

4. The "one person one vote" principle was initially applied to state legislatures and congressional districts. Baker v. Carr, 369 U.S. 186, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962); Wesberry v. Sanders, 376 U.S. 1, 84 S. Ct. 526, 11 L. Ed. 2d 481 (1964); Reynolds v. Sims, 377 U.S. 533, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964). Since then, it has been extended to the election of county and municipal representatives where such governments exercise substantial governmental powers. *See, e.g.,* Abate v. Mundt, 403 U.S. 182, 91 S. Ct. 1904, 29 L. Ed. 2d 399 (1971); Hadley v. Junior College District, 397 U.S. 50, 90 S. Ct. 791, 25 L. Ed. 2d 45 (1970); Avery v. Midland County, 390 U.S. 474, 88 S. Ct. 1114, 20 L. Ed. 2d 45 (1968); Montgomery County v. Garrott, 243 Md. 634, 222 A.2d 164 (1966). According to College Park's charter, Code of the City of College Park, Art. XI (1965), the City does or may exercise substantial governmental authority. Therefore, the apportionment of its councilmanic districts is clearly within the scope of the "one person one vote" principle.

person's right to vote are subject to careful scrutiny. This was explained by the Supreme Court in *Reynolds v. Sims, supra,* 377 U.S. at 561-562, as follows:

"While the result of a court decision in a state legislative apportionment controversy may be to require the restructuring of the geographical distribution of seats in a state legislature, the judicial focus must be concentrated upon ascertaining whether there has been any discrimination against certain of the State's citizens which constitutes an impermissible impairment of their constitutionally protected right to vote. Like *Skinner v. Oklahoma,* 316 U.S. 535, such a case 'touches a sensitive and important area of human rights,' and 'involves one of the basic civil rights of man,' presenting questions of alleged 'invidious discriminations ... against groups or types of individuals in violation of the constitutional guaranty of just and equal laws.' 316 U.S., at 536, 541. *Undoubtedly, the right of suffrage is a fundamental matter* in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, *any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."* (Emphasis supplied.)

*Abate v. Mundt,* 403 U.S. 182, 185, 91 S. Ct. 1904, 1906-1907, 29 L. Ed. 2d 399 (1971); *Kramer v. Union School District,* 395 U.S. 621, 626-630, 89 S. Ct. 1886, 1889-1891, 23 L. Ed. 2d 583 (1969); *O. C. Taxpayers v. Ocean City,* 280 Md. 585, 594, 375 A.2d 541 (1977).

The City has attempted to justify its exclusion from the apportionment base of on-campus students who have not registered to vote by arguing that these students are transients and are not in fact residents of College Park. The City accordingly argues that to include these nonresidents would dilute the weight of the votes of true residents of the

City who would be expected to have a greater interest in municipal affairs. In support of its argument, the City points to language in *Burns v. Richardson,* 384 U.S. 73, 91-92, 86 S. Ct. 1286, 1296-1297, 16 L. Ed. 2d 376 (1966), where the Supreme Court stated:

"We start with the proposition that the Equal Protection Clause does not require the States to use total population figures derived from the federal census as the standard by which this substantial population equivalency is to be measured. Although total population figures were in fact the basis of comparison in . . . [the case of *Reynolds v. Sims*] and most of the others decided that day, our discussion carefully left open the question what population was being referred to. At several points, we discussed substantial equivalence in terms of voter population or citizen population, making no distinction between the acceptability of such a test and a test based on total population. Indeed, in *WMCA, Inc. v. Lomenzo,* 377 U.S. 633, decided the same day, we treated an apportionment based upon United States citizen population as presenting problems no different from apportionments using a total population measure. Neither in *Reynolds v. Sims* nor in any other decision has this Court suggested that the States are required to include aliens, transients, short-term or temporary residents, or persons denied the vote for conviction of crime, in the apportionment base by which their legislators are distributed and against which compliance with the Equal Protection Clause is to be measured. The decision to include or exclude any such group involves choices about the nature of representation with which we have been shown no constitutionally founded reason to interfere. Unless a choice is one the Constitution forbids, cf., *e.g., Carrington v. Rash,* 380 U.S. 89, the resulting apportionment base offends no constitutional bar, and compliance with the rule established in *Reynolds v. Sims* is to be measured thereby."

It is clear, however, that the City could not invoke the theory that students are generally transients, in order to deny the right to vote to any student who in fact met the voting qualifications of the City Charter.[5] *See Evans v. Cornman,* 398 U.S. 419, 90 S. Ct. 1752, 26 L. Ed. 2d 370 (1970); *Carrington v. Rash,* 380 U.S. 89, 85 S. Ct. 775, 13 L. Ed. 2d 675 (1965); *Whatley v. Clark,* 482 F.2d 1230 (5th Cir. 1973), *cert. denied,* 415 U.S. 934, 94 S. Ct. 1449, 39 L. Ed. 2d 492 (1974). For example, the Supreme Court in *Carrington v. Rash, supra,* 380 U.S. at 93-96, held that Texas could not constitutionally deny military personnel the right to vote where such military personnel had moved their residence to Texas after their entrance into the military, if those persons otherwise met the state's voter qualification requirements.

---

5. The voting qualifications are set forth in the City's charter. Code of the City of College Park, § 14 (1965). They are:

"Except as otherwise provided herein, any person possessed of all the qualifications that are necessary to entitle a person to exercise the right to register as a voter of the State of Maryland, under the general election laws, shall be entitled to be registered; provided, however, that every applicant to register shall be a citizen of the United States and at least eighteen (18) years of age on or before election day and shall have his actual residence in the City of College Park, in the sense that he had no other residence elsewhere, for the period of ninety (90) days next preceding a municipal election and shall satisfy the Registering Officer of these facts. Any applicant to register who shall be registered as a voter elsewhere in the State of Maryland shall not be permitted to register unless there is filed with the Registration Officer of said city the applicant's following affirmative affidavit under oath:

A. Do you hereby affirm your intent to be a member of the City of College Park community?

B. Are you presently registered to vote in a state other than Maryland, a county other than Prince George's or any other municipality, and if so, will you cancel that registration as soon as practicable after this registration is completed?

C. Are you aware that when you register in the City of College Park, it will thenceforth be presumed that your residence is here for voting purposes and that you will have to overcome that presumption should you later attempt to register in a state or county or municipality other than Maryland, Prince George's County, the City of College Park, respectively, and do you accept this fact? The word 'residence' for these purposes means the affiant's primary residence, the place where he will be registered to vote, where he presently resides, and plans to reside, except for short temporary absences, as for example, a vacation or hospitalization."

Not only is it impermissible to deny the right to vote to students or servicemen who otherwise meet voter qualifications, but a city may not dilute the votes of persons in a particular district by a bald assertion that it is populated by a large class of purported transients such as students or servicemen. *Kirkpatrick v. Preisler,* 394 U.S. 526, 534-535, 89 S. Ct. 1225, 1230-1231, 22 L. Ed. 2d 519 (1969); *Davis v. Mann,* 377 U.S. 678, 691, 84 S. Ct. 1441, 1448, 12 L. Ed. 2d 609 (1964). *See Egan v. Hammond,* 502 P.2d 856 (Alaska 1972); *In Re Opinion of the Justices,* 111 N.H. 146, 276 A.2d 825 (1971); *Tp. of Franklin, Etc. v. Board of Ed., Etc.,* 74 N.J. 345, 378 A.2d 218, 219 n. 2 (1977), *cert. denied,* 435 U.S. 950, 98 S. Ct. 1576, 55 L. Ed. 2d 800 (1978); *Seaman v. Fedourich,* 16 N.Y.2d 94, 209 N.E.2d 778, 784, 262 N.Y.S.2d 444 (1965). *See also Mahan v. Howell,* 410 U.S. 315, 330-332, 93 S. Ct. 979, 988-989, 35 L. Ed. 2d 320 (1973); *Groh v. Egan,* 526 P.2d 863, 869-874 (Alaska 1974).

In *Davis v. Mann, supra,* 377 U.S. at 691, the Supreme Court rejected the

"appellants' argument that the underrepresentation ... [in three counties] is constitutionally justifiable since it allegedly resulted in part from the fact that those areas contain large numbers of military and military-related personnel. Discrimination against a class of individuals, merely because of the nature of their employment, without more being shown, is constitutionally impermissible."

Similarly, in *Kirkpatrick v. Preisler, supra,* the Supreme Court rejected Missouri's attempt to explain population variances in its Congressional districting because of large numbers of military personnel and college students present within the district. The Court stated (394 U.S. at 534-535):

"Missouri made no attempt to ascertain the number of eligible voters in each district and to apportion accordingly. At best it made haphazard adjustments to a scheme based on total population: overpopulation in the Eighth District was explained away by the presence in that district of a military

base and a university; no attempt was made to account for the presence of universities in other districts or the disproportionate numbers of newly arrived and short-term residents in the City of St. Louis. Even as to the Eighth District, there is no indication that the excess population allocated to that district corresponds to the alleged extraordinary additional numbers of noneligible voters there."

The City of College Park has attempted to justify its assertion that the students are not City residents by pointing to the low number of students who have registered to vote and by statistics supplied by the University indicating that only 900 of the 8,000 on-campus students originally came from Prince George's County. It is questionable whether these facts alone would be sufficient to validly support a conclusion that all students, except those who have registered to vote, are presently transients. However, assuming arguendo that the City could reasonably reach this conclusion, other aspects of the apportionment plan render it unconstitutional.[6]

In conformance with the circuit court's order to submit a new plan, the City of College Park only excluded students from its apportionment base in the third and fifth districts — the two "student" districts. The students who were excluded were those residing in dormitory facilities who had not registered to vote. The record demonstrates, however, that

---

**6.** Even if it could be assumed that voter registration provided sufficient indicia of residency, the use here of the different apportionment bases of registered voters for one group of persons or districts, and total census population for a different group of persons or districts, might still violate equal protection principles. *See* Town of Greenburgh v. Board of Supervisors, 53 Misc. 2d 88, 277 N.Y.S.2d 885, 895-896 (1967). Although the use of registered voters as an apportionment base seems to be less favored than total or citizen population, *see* Burns v. Richardson, 384 U.S. 73, 92-93, 86 S. Ct. 1286, 16 L. Ed. 2d 376 (1966); Ellis v. Mayor and City Council of Baltimore, 352 F.2d 123 (4th Cir. 1965); Preisler v. Mayor of City of St. Louis, 303 F. Supp. 1071 (E.D. Mo. 1969), it was at least used uniformly in all of the districts of the geographic unit in cases which have permitted it to be used. Burns v. Richardson, *supra;* Martin v. Venables, 401 F. Supp. 611 (D. Conn. 1975); Reynolds v. Gallion ex rel. Attorney General of Alabama, 308 F. Supp. 803 (M.D. Ala. 1969).

the City did not attempt either to determine the number of or to exclude those students who had not registered to vote and who resided in the other six districts. For example, the record shows that the second district contains several fraternity and sorority houses. Students residing in these houses were included in the apportionment base whether or not they had registered to vote. In addition, there is an inference that the City did not exclude those students who lived in private residences or fraternity and sorority houses within the "student districts," *i.e.,* the third and fifth districts.

The concept of equal protection of the laws has traditionally required "the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged." *Reynolds v. Sims, supra,* 377 U.S. at 565, 84 S. Ct. at 1383. Thus, once a constitutionally permissible apportionment base is chosen, equal protection would generally require that the apportionment base would be applied uniformly to all people and throughout all districts. According to the City's premise that students who have not registered to vote are not domiciliaries, it would seem to follow that all students who are not registered to vote are in the same class and should not be included in the apportionment base, or at least there should likewise be an exclusion of large groups such as those living in the fraternities and sororities in the second district. However, the City of College Park has differentiated among the students by not including in the apportionment base those non-voter registered students in the third and fifth districts, but including in the base large groups of students in the fraternity and sorority houses in the second district regardless of whether they have registered to vote. Moreover, it is possible that the City has not even treated large groups of third and fifth district students the same, for there is an inference in the record that the City only excluded unregistered dormitory residents but did not exclude any students living in the fraternities or sororities located in the third district.

The City has offered no explanation for treating significant groups of students differently. In the circumstances of this

case, permitting a large number of students who have not registered to vote to be included within the apportionment base while excluding others who are similarly situated, certainly does not insure that only true domiciliaries will be counted.

In sum, the apportionment plan submitted by the City in accordance with the guidelines laid down by the circuit court, and later approved by the circuit court, contains classifications in the population base which cannot be justified when "carefully and meticulously scrutinized" (*Reynolds v. Sims, supra,* 377 U.S. at 562). It violates the Equal Protection Clause of the Fourteenth Amendment and Art. 24 of the Maryland Declaration of Rights. *See Board v. Goodsell,* 284 Md. 279, 293 n. 7, 396 A.2d 1033 (1979).

> *Judgment reversed and case remanded to the Circuit Court for Prince George's County for further proceedings not inconsistent with this opinion.*
> *Appellees to pay costs.*