RENEE DuBOIS ET AL. *v.* CITY OF COLLEGE PARK ET AL.

[No. 96, September Term, 1981.]

*Decided July 19, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*David K. Nisbett* and *Kenneth A. Lechter* for appellants/cross-appellees.

*L. Marc Zell*, with whom were *Morris Topf* and *Topf & Zell* on the brief, for appellees/cross-appellants.

ELDRIDGE, J., delivered the opinion of the Court.

This case, before us for the third time, is the culmination of a suit initially filed in October 1975 by three University of Maryland students challenging the apportionment of councilmanic districts in the City of College Park, Maryland.

The City of College Park is the site of the University of Maryland's principal campus. With a population of approximately 28,000 persons,[1] the City is divided into eight councilmanic districts, each of which elects a City Councilman. A large portion of the third and fifth districts consists of the University of Maryland campus, and all of the University's student dormitories are located in those two districts. In addition, several fraternity and sorority houses in which University students reside are in the second district. At the inception of this suit, the City had apportioned its voting districts by subtracting from its total federal census population those students who resided on the University's campus. That base was then divided equally into the eight councilmanic districts.

In October 1975 three students, all registered voters of College Park, filed a class action in the Circuit Court for Prince George's County alleging that the apportionment scheme employed by the City violated the Equal Protection Clause of the Fourteenth Amendment and the equal protection principle embodied in Article 24 of the Maryland Declaration of Rights. The plaintiffs claimed that the exclusion of on-campus students from the apportionment base diluted their votes because the third and fifth districts con-

---

1. *1981 Municipal Yearbook 25.*

tained two to three times the population of the other six districts. The circuit court dismissed the claim, concluding that the three plaintiffs had no standing to maintain the action because they were not domiciled in College Park and were not properly registered to vote.

On appeal, in *DuBois v. City of College Park,* 280 Md. 525, 375 A.2d 1098 (1977) *(DuBois I),* this Court reversed, deciding that the plaintiffs' status as registered voters of the City gave them standing to challenge the apportionment of the councilmanic districts. We held that a collateral attack upon the plaintiffs' status as registered voters could not be made by raising the issue of standing in a reapportionment case, and that any challenge to the plaintiffs' voter status must be made through the procedures prescribed by statute and the City Charter for making such challenges. 280 Md. at 529, 533-534. The case was remanded for a determination of the merits.

Following the remand, the circuit court held that the councilmanic districts were unconstitutionally apportioned. The circuit court went on to approve a new apportionment plan which, in six of the districts, was based upon total population and included all students in the apportionment base. However, with respect to the third and fifth councilmanic districts, the new plan included in the population base all off-campus students and all on-campus students who had registered to vote. The new plan excluded from the base all on-campus students in the third and fifth districts who had not registered to vote.

This Court reviewed the constitutionality of the new apportionment plan in *DuBois v. City of College Park,* 286 Md. 677, 410 A.2d 577 (1980) *(DuBois II).* Because the plan included all students from districts one, two, four, six, seven and eight in the apportionment base, whether they were registered to vote or not, while excluding on-campus students in districts three and five from the base unless they were registered to vote, the Court held that the plan violated the Equal Protection Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights. 286

Md. at 691. The case was again remanded for further proceedings.

Thereafter, the City Council of College Park adopted by resolution a plan to apportion the districts entirely on the basis of registered voters rather than total population. Under this plan the City will eradicate previous voter registration lists and "conduct an entirely new City-wide voter registration drive." Each housing unit in the City is to be advised of the registration drive. In addition, the City will "deputize" a substantial number of persons whose duty it will be to ensure that all registrants are residents of College Park. Within three months after completion of the registration drive the City will be apportioned into eight districts. Districts are to be reapportioned every five years if there is a variance of five percent or more in the number of registered voters between any district and the mathematical average of all districts. To implement this plan the City would amend its Charter and rescind all inconsistent portions of the present Charter. Finally, voting eligibility requirements are not to be changed.

The above-summarized plan was approved by the circuit court after a hearing, and the plaintiffs took an appeal to the Court of Special Appeals, claiming that the plan is unconstitutional. As in *DuBois I* and *DuBois II,* we issued a writ of certiorari prior to a hearing in the intermediate appellate court.[2]

---

2. The plan described in the text was designated "Plan B" by the City Council. The City Council also adopted an alternative plan, Plan A, which proposed that a census be taken to determine the number of College Park domiciliaries. From the results of that census, districts would be evenly apportioned. The plan under consideration here, Plan B, was, however, the City's preferred choice as indicated by the following colloquy at oral argument before us:

"COUNSEL FOR THE CITY: We have submitted the cross-appeal on Plan A in the event that the Court would find Judge Mattingly's ruling on Plan B . . .

THE COURT: You only want us to . . . reach your cross-appeal if we reverse on their appeal [challenging Plan B].

COUNSEL FOR THE CITY: That is correct . . . .

THE COURT: So this is really a concession, a stipulation, that the City really wants Plan B.

COUNSEL FOR THE CITY: That's correct."

The plaintiffs' constitutional objection to College Park's plan is that the apportionment is based upon registered voters rather than total federal census population. The plaintiffs, using registered voter figures for the year 1975, claim that persons in councilmanic districts three and five will continue to be underrepresented in light of the 1970 federal census.

The Supreme Court, in *Reynolds v. Sims,* 377 U.S. 533, 568, 84 S.Ct. 1362, 1385, 12 L.Ed.2d 506 (1964), held that, under the Equal Protection Clause, a state legislature "must be apportioned on a population basis." While pointing out that some "divergences from a strict population standard" are constitutionally permissible if "based on legitimate considerations incident to the effectuation of a rational state policy," the Court in *Reynolds* nevertheless held that "the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." 377 U.S. at 579. As pointed out by us in *DuBois II,* 286 Md. at 684, n. 4, the principles set forth in *Reynolds v. Sims,* and in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), extend to elected local government units exercising substantial governmental authority. *See Town of Lockport v. Citizens For Community Action,* 430 U.S. 259, 266, n. 11, 97 S.Ct. 1047, 51 L.Ed.2d 313 (1977); *Abate v. Mundt,* 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971); *Hadley v. Junior College District,* 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970); *Montgomery County v. Garrott,* 243 Md. 634, 639, 222 A.2d 164 (1966).

While population is the basis upon which districts must be apportioned, the plaintiffs' argument in this case overlooks the holdings of the Supreme Court that such a population basis is not required to be the federal census figures in all cases. Thus, the use of "citizen" or " domiciliary" population may be permissible rather than total federal census population. Furthermore, if the use of registered voters as a basis

---

Thus, because of our decision in this case, we need not and do not consider the constitutionality of Plan A.

produces a distribution of elected representatives substantially the same as a permissible population basis would produce, registered voters may be used. This was made clear by the Supreme Court in *Burns v. Richardson,* 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966).

In *Burns v. Richardson,* the State of Hawaii, because of its large transient military population, proposed to use registered voters as the basis for apportionment of the state legislature. Those challenging the plan, like the plaintiffs in the case at bar, pointed to "the sizable differences in results produced by . . . distribution [according to registered voters] in contrast to that produced by the distribution according to the State's total population, as measured by the federal census figures." 384 U.S. at 90. The Supreme Court responded by holding that the population basis for apportionment under *Reynolds v. Sims* did not necessarily mean federal census population *(Burns,* 384 U.S. at 91, emphasis supplied):

> "The holding in Reynolds v. Sims, as we characterized it in the other cases decided on the same day, is that 'both houses of a bicameral state legislature must be apportioned substantially on a population basis.' *We start with the proposition that the Equal Protection Clause does not require the States to use total population figures derived from the federal census as the standard by which this substantial population equivalency is to be measured.* Although total population figures were in fact the basis of comparison in that case and most of the others decided that day, our discussion carefully left open the question what population was being referred to. At several points, we discussed substantial equivalence in terms of voter population or citizen population, making no distinction between the acceptability of such a test and a test based on total population."

In language just as applicable to College Park with its large transient student population, as to Hawaii with its large

transient military population, the Court continued *(id.* at 92, emphasis supplied):

> "Neither in Reynolds v. Sims nor in any other decision has this Court suggested that the States are required to include aliens, *transients, short-term or temporary residents,* or persons denied the vote for conviction of crime in the apportionment base by which their legislators are distributed and against which compliance with the Equal Protection Clause is to be measured."

The Court in *Burns* then pointed out that the use of registered voters or actual voters as the basis for apportionment does present some problems *(id.* at 92-93):

> "Such a basis depends not only upon criteria such as govern state citizenship, but also upon the extent of political activity of those eligible to register and vote. Each is thus susceptible to improper influences by which those in political power might be able to perpetuate underrepresentation of groups constitutionally entitled to participate in the electoral process, or perpetuate a 'ghost of prior malapportionment.' Moreover, 'fluctuations in the number of registered voters in a given election may be sudden and substantial, caused by such fortuitous factors as a peculiarly controversial election issue, a particularly popular candidate, or even weather conditions.' Ellis v. Mayor & City Council of Baltimore, 352 F.2d 123, 130 (C.A.4th Cir. 1965). Such effects must be particularly a matter of concern where, as in the case of Hawaii apportionment, registration figures derived from a single election are made controlling for as long as 10 years."

The Court then held that Hawaii's use of registered voters as the basis for apportionment

> "satisfies the Equal Protection Clause only because on this record it was found to have produced a distribution of legislators not substantially different

from that which would have resulted from the use
of a permissible population basis." *(id.* at 93).

The fact that apportionment on a voter registration basis
failed to result in the same distribution as apportionment on
a federal census population basis was deemed "insufficient
to establish constitutional deficiency" in light of the large
transient military population and large number of tourists
who may have been counted in the census figures. *Id.* at
94-95. The Court, reiterating that "[i]t is enough if it appears
that the distribution of registered voters approximates dis-
tribution of . . . citizens or any other permissible population
base" *(id.* at 95), stated that it found no error in the trial
court's "conclusion that the apportionment achieved by use
of a registered voters basis substantially approximated that
which would have appeared had . . . citizen population been
the guide." *Id.* at 96.

Consequently, the teaching of *Burns v. Richardson* is that
voter registration, to be valid as an apportionment base,
need not produce the same result as the use of federal census
population would produce. Instead, voter registration may
be used as an apportionment base if it produces a result not
substantially different than that which would be produced
by the use of another permissible population base, such as
citizen population. See also, *Gaffney v. Cummings,* 412 U.S.
735, 746-748, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), *Eli v.
Klahr,* 403 U.S. 108, 115, n. 7, 91 S.Ct. 1803, 29 L.Ed.2d 352
(1971); *Pate v. El Paso County, Texas,* 337 F.Supp. 95 (S.D.
Tex.) *aff'd* 400 U.S. 806, 91 S.Ct. 55, 27 L.Ed.2d 38 (1970);
*Borough of Bethel Park v. Stans,* 319 F.Supp. 971, 977 (W.D.
Pa. 1970), *aff'd* 449 F.2d 575 (3d Cir. 1971); *Egan v.
Hammond,* 502 P.2d 856 (Alas. 1972). *Cf., Ellis v. Mayor
and City Council of Baltimore,* 352 F.2d 123 (4th Cir. 1965).

Applying these principles to the present case produces a
clear result. The plaintiffs have utterly failed to show that
the use of voter registration as the apportionment base
under College Park's new plan will produce a result substan-
tially different than would be produced under a permissible

population base. In fact, no such showing could be made at this time, as under the plan approved by the circuit court the present voter registration lists will be cancelled, and new voter registration lists will be compiled following a voter registration drive. After the new voter registration lists are compiled, the apportionment plan might possibly result in the same distribution among districts as a plan based upon the 1980 federal census. Or the plan based on the new voter registration lists may result in the same distribution among districts as a plan based upon citizen or domiciliary population. College Park's new apportionment plan, which is not yet implemented, does not on its face violate equal protection principles.

*Judgment affirmed.*
*Petitioners to pay costs.*