792 A.2d 349

THE FISCHER ORGANIZATION, INC.

v.

LANDRY'S SEAFOOD RESTAURANTS, INC.

No. 181, Sept. Term, 2001.

Court of Special Appeals of Maryland.

March 1, 2002.

66

Tamir Damari (Stanley H. Goldschmidt on the brief), Washington, DC, for appellant.

William F. Ryan, Jr., (Steven E. Tiller and Whiteford, Taylor & Preston L.L.P. on the brief), Baltimore, for appellee.

Argued before DAVIS, HOLLANDER, and BARBERA, JJ.

DAVIS, J.

Appellant, The Fischer Organization, Inc., filed suit against appellee, Landry's Seafood Restaurants, Inc., in the Circuit Court for Prince George's County. The four-count complaint, alleging breach of contract, quantum meruit, promissory estoppel, and fraud in the inducement, was filed on August 12, 1999. Appellee filed its answer on October 22, 1999. From January 10–11, 2001, a bench trial was conducted (Thomas Smith, J.) and, on February 14, 2001, the parties submitted post-trial memoranda summarizing the arguments and evidence adduced at trial. The trial court rendered a judgment in favor of appellee on March 15, 2001. Appellant filed this timely appeal on March 22, 2001, wherein it presented three questions, which we rephrase for clarity as follows:

I. Did the trial court commit reversible error by rendering a judgment in favor of appellee on appellant's claim for breach of contract?

II. Did the trial court commit reversible error by rendering a judgment in favor of appellee on appellant's claim for unjust enrichment?

III. Did the trial court commit an abuse of discretion when it deemed portions of a deposition transcript of appellee's designated representative inadmissible?

We answer the above questions in the negative and, therefore, affirm the judgment of the trial court.

## FACTUAL BACKGROUND

This appeal stems from a brokerage dispute. Appellant is a real estate brokerage firm whose President is Benson J. Fischer, a duly licensed real estate broker in the State of Maryland. Appellee is a Texas corporation that owns and operates a number of restaurants throughout the country. In 1996, appellee acquired Bayport Restaurants, Inc. (Bayport), in accordance with the terms of a merger. At the time, one of Bayport's wholly-owned subsidiaries, Take–Away/King Shopping Center, Inc. (Take–Away), leased commercial premises located at King Shopping Center, in Prince George's County, from King Associates Limited Partnership (King Associates).

At or about the time of the merger, Take–Away ceased paying rent to King Associates, with approximately fifteen years remaining under the terms of the lease. Consequently, King Associates declared appellee, the parent company of Take–Away, in default under the lease for failure to pay rent and abandonment of its business operations. Appellee's right to possession of the premises was terminated shortly thereafter.

On November 18, 1996, King Associates filed a lawsuit against Take–Away and appellee for breach of Take–Away's lease. Because fifteen years remained on the lease, appellee faced potential liability in the amount of $700,000, reflecting total base rent and "build-out" rent remaining due over the balance of the lease term. In addition to the approximately $700,000 owed on the remaining lease term, appellee faced liability arising out of obligations to pay common area maintenance costs and real estate taxes.

Meanwhile, Fischer learned of Take–Away's abandoned properties in Prince George's County,[1] while driving through the area on a routine survey of possible vacancies. Appellant approached appellee and offered its services to locate replacement tenants for the vacancies, in order to help mitigate appellee's liability as guarantor under the lease. On October 8, 1996, appellant sent appellee a proposed commission agreement, whereby appellee would pay appellant a four percent brokerage commission "of the aggregate value of the entire lease term, including any fixed increases, renewals[,] or expansions of the [l]ease," for "procuring a client that leases or purchases the property . . . on terms acceptable to [appellee]." (Commission Agreement.) Appellee accepted the proposed agreement in mid-November, limiting its duration to six months and adding the following paragraph, to which appellant agreed:

> It is expressly agreed and understood that this Letter Agreement is contingent upon [appellee] retaining and being able to transfer its rights in and to the Lease, Leased Premises[,] and personal property located thereon. In the event that [appellee] is unable to transfer its rights to the real and personal property which is the subject of this agreement at closing, this [a]greement shall be null and void and all parties shall be relieved of liability hereunder.

At the same time, Fischer was engaged in negotiations with Morton Bender, general partner in King Associates, whereby King Associates would pay appellant a brokerage commission equal to four percent of the aggregate value of any lease transaction consummated between King Associates and a suitable replacement tenant. According to appellant, all parties were made aware of both brokerage agreements; however, both Bender and appellee's representative, Matt Dillick, denied at trial that either was aware of appellant's other commission agreement. Indeed, Bender testified that, had he known

---

1. Take–Away abandoned two properties—one at a Silver Hill Road location and another in King Shopping Center.

of appellee's agreement with appellant, he would not have entered into an agreement with appellant.

Appellant then located Rejnaj of King Shopping Center, a franchisee of the Popeye's fast food chicken chain, as a possible replacement tenant for the shopping center. On December 2, 1996, appellant prepared a Letter of Intent between appellee and Rejnaj, setting forth the terms of the proposed tenancy, including an additional guarantee of $50,000 from Popeyes Limited Partnership II (PLP II). According to appellee, the letter provided, among other things, for monthly rent "in amounts less than those owed by [appellee] to [King Associates] in its lease, an extremely limited guarantee from an unknown entity, and no "key" money for the leasehold improvements, restaurant equipment[,] and other personal property left in the space of which Rejnaj would take control." In addition, appellee claims, it would have had to guarantee Rejnaj's obligations. For all of these reasons, appellee found the proposal unacceptable and, as a result, rejected it in a letter to appellant dated December 16, 1996. That letter stated, in relevant part:

In response to your letter dated December 16, 1996, please re-read your proposal. You have not brought us a thirty year lease but rather a one year lease with [twenty-nine] option years. There are no guarantees and you have not removed us from the lease.

We are interested in pursuing this arrangement but will not pay $78,000 in commission for this type of deal.

Appellant responded in a letter, also dated December 16, 1996, stating, in relevant part:

The [brokerage] provision clearly states that a four percent commission shall be due and payable for the total aggregate value of the entire Lease Term. A guarantee, or lack of guarantee, has absolutely nothing to do with the aggregate value of the Lease, [and] therefore should not be calculated to increase or decrease the commission value.

During this time, litigation between King Associates and appellee continued. On March 15, 1997, King Associates filed

a Motion for Summary Judgment and, on April 8, 1997, appellee filed an opposition thereto, noting that it had "retained [appellant] to attempt to relet the premises." In its motion, appellee argued that it should benefit from any mitigation of damages "[i]f . . . it is discovered that [King Associates] would benefit from future lease payments from the Popeye's franchisee in excess of those which it could have expected from [appellee] but for [appellee's] offer of surrender of the premises."

Appellant made no effort to remove the objectionable provisions in the Rejnaj Lease, nor did it engage in further negotiations in an attempt to incorporate terms that would be acceptable to appellee; rather, it approached King Associates to negotiate the Rejnaj Lease based on the original Letter of Intent. On May 1, 1997, King Associates and Rejnaj entered into a lease agreement that was, according to appellant, "substantially based upon the terms of the Letter of Intent prepared by appellant"—the same terms to which appellee had objected. King Associates paid appellant a commission on January 26, 1999 and later sought reimbursement from appellee as part of its litigation seeking damages arising out of Take–Away's abandonment of the premises. On January 27, 1999, appellant transmitted its first invoice to appellee, reminding appellee that it owed appellant a brokerage commission of $44,940. Appellee never paid appellant, thus the basis of the breach of contract claim filed in the trial court.

## STANDARD OF REVIEW

The judgment of a trial court will not be set aside unless clearly erroneous or legally incorrect. Md. Rule 8–131(c). If, in considering the evidence produced at trial in the light most favorable to the prevailing party, an appellate court determines that there is sufficient evidence to support the judgment of the trial court, it will not be disturbed. "Moreover, if there is any competent, material evidence to support the factual findings below, we cannot hold those findings to be clearly erroneous." *Mayor of Rockville v. Walker*, 100 Md. App. 240, 256, 640 A.2d 751 (1994).

## DISCUSSION

### I

■ Appellant contends that appellant was entitled to a commission pursuant to the terms of the Commission Agreement, as it located a replacement tenant who was "ready, willing[,] and able to lease the premises on terms acceptable to appellee." Appellee, on the other hand, responds that the proposal was unacceptable and, as a result, it was not liable for the commission. Agreeing with appellee, the trial court found that appellant's "[b]reach of [c]ontract claims fail for non-compliance with the [Commission] Agreement with [appellee]." For the reasons discussed below, we concur with the trial court and conclude that, pursuant to the terms of the Commission Agreement, appellee's dissatisfaction with the Rejnaj Lease discharged its obligation to appellant.

The general rule controlling a real estate broker's entitlement to a commission is located in Md.Code (1996 Repl.Vol.), Real Prop. (R.P.) § 14–105:

In the absence of [a] special agreement to the contrary, if a real estate broker employed to ... lease, or otherwise negotiate an estate ... procures in good faith a ... lessee ... and the person procured is accepted by the employer and enters into a valid, binding and enforceable written contract, in terms acceptable to the employer ... the broker is deemed to have earned the customary or agreed commission.

■ It is undisputed that, in the case *sub judice,* a special agreement did exist and, therefore, its terms governed appellant's entitlement to such a commission. *See, e.g., DeFranceaux Realty Group, Inc. v. Leeth,* 283 Md. 611, 391 A.2d 1209 (1978) (holding that an appellate court is to look "to the terms of the contract between the parties in determining the right of the broker to receive commissions"). When the terms of an agreement are clear and unambiguous, a court will give effect to the general connotation of the terms. *Wells v. Chevy Chase*

*Bank, F.S.B.*, 363 Md. 232, 251, 768 A.2d 620, (2001)(quoting *Rothman v. Silver*, 245 Md. 292, 296, 226 A.2d 308 (1967)).

Turning to the terms of the Commission Agreement, it is clear that appellee agreed to pay appellant a four percent brokerage commission in exchange for appellant's procurement of a replacement tenant *that would be acceptable to appellee.* In the event appellant failed to find an adequate replacement, however, appellee would not be liable for the commission. Moreover, because appellee did not transfer its rights to the property to Rejnaj, in violation of the added paragraph to that effect, the terms of the agreement were not satisfied.

This analysis of the agreement echoes that of the trial judge, who determined that appellee "rejected the [Rejnaj] Lease for sound business reasons" and, as a result, the agreement "between [appellant] and [appellee] was null and void and both [p]arties [were] relieved from liability thereunder." Moreover, the trial court found that appellant, by entering into two agreements—one with appellee and another with King Associates—was merely covering its bases, reasoning that "[i]f the Rejnaj lease transaction was an assignment or sub-lease, by [appellee], [appellee] would pay the fee. If the Rejnaj lease transaction was with [King Associates], the Landlord would pay the fee."

At trial, appellee presented Dillick, its Director of Real Estate, who testified that appellee had at least three concerns regarding the Rejnaj proposal. First, according to Dillick, the terms of the proposal stated that Rejnaj would have been obligated to pay $3,750 per month during the first five years of its lease. Under its lease with King Associates; however, appellee was obligated to pay $4,411.30, which would have left appellee with a continuing monthly obligation in the amount of $661.30.[2] Second, Rejnaj provided a guarantee of only $50,000

2. Dillick also testified that, because appellee's monthly rent would increase to $4,786.30 for years four and five of its lease with King Associates, its continuing monthly obligation would increase to $1,036.30.

from PLP II, an entity unknown to appellee. This guarantee would only provide assurances for one year of the entire obligation. Third, Rejnaj did not offer any "key" money to compensate appellee for its investments in the building and equipment contained therein. Dillick testified that appellee, through its predecessor-in-interest, had expended nearly $1,000,000 to add restaurant equipment to the premises. Appellant responds by simply stating that "this entirely self-serving testimony by Dillick should not be deemed sufficient to defeat [a]ppellant's entitlement to a commission," adding that "none of these supposed demands [are] referenced anywhere in the Commission Agreement or the myriad of letters and other documents proffered by the parties at trial." Indeed, appellant claims that appellee was "unable to state with any degree of certainty that [a]ppellee ever informed [a]ppellant that it found the [Rejnaj] Letter of Intent to be unacceptable."

We initially note appellant's flawed attempt to shift the burden of proof to appellee. In an action for breach of contract, it is the party alleging the breach that bears the burden. *See, e.g., Glen Alden Corp. v. Duvall,* 240 Md. 405, 215 A.2d 155 (1965). Implicit in appellant's argument is the proposition that *appellee* was charged with the burden of *disproving* appellant's claim. As stated above, however, concomitant with well-established principles, it was *appellant* who shouldered the burden of *proving* its entitlement to a commission. Furthermore, in response to appellant's argument regarding "appellee's supposed demands," we reference the Commission Agreement itself, as well as the December 16, 1996 letter from Al Jaksa, appellee's Vice President, to appellant, wherein Jaksa informed appellant that the Rejnaj proposal was unacceptable. This letter constitutes a clear rejection of the proposal. Appellant's argument that it constituted "an acceptance by appellee of the Letter of Intent" is devoid of all logic.[3]

---

3. Appellant additionally takes issue with the trial court's findings regarding appellant's agreements with appellee and King Associates.

## II

■ Appellant next contends that, assuming, *arguendo*, it was not entitled to recover a commission based on a breach of contract theory, it should nevertheless be entitled to recover based on appellee's unjust enrichment. Citing the proposition that, as a general rule, no quasi-contractual claim can arise when a contract exists, appellee responds that appellant cannot recover on the basis of unjust enrichment.

■ Unjust enrichment has been defined as:

[T]he unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. A person is enriched if he [or she] has received a benefit, and he [or she] is unjustly enriched if retention of the benefit would be unjust. Unjust enrichment of a person occurs when he [or she] has and retains money or benefits which in justice and equity belong to another.

*Kline, Inc. v. Signet Bank/Maryland*, 102 Md.App. 727, 731, 651 A.2d 442 (1995)(quoting 66 Am.Jur.2d Restitution and Applied Contracts § 3 (1973)). In Maryland, to sustain an unjust enrichment claim, a plaintiff must establish (1) that he or she conferred a benefit upon the defendant, (2) that the defendant appreciated or had knowledge of the benefit, and (3) that the defendant accepted or retained the benefit under "such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." *Id.*

---

Appellee contends that, because appellant never notified both clients of the dual representation, it would be impermissible to allow appellant to collect an eight percent commission. Appellant posits that its entitlement to a commission should not be vitiated by any breach of fiduciary duty to appellee. The trial court agreed with appellee, articulating findings to that effect in its March 15, 2001 order. Because we concur with the trial court's conclusion that the failure of appellant to procure an acceptable replacement tenant discharged any financial obligations on the part of appellee, we decline to discuss the merits of this argument. *See, e.g., DuBois v. City of College Park*, 286 Md. 677, 683, 410 A.2d 577 (1980) (holding that the judgment of a trial court can be affirmed if judgment is correct, even if rationale for judgment is wrong).

at 731–32, 651 A.2d 442 (1995) (1995)(citing *Yost v. Early,* 87 Md.App. 364, 387, 589 A.2d 1291 (1991)); *see also Mogavero v. Silverstein,* 142 Md.App. 259, 790 A.2d 43 (2002).

In its March 15, 2001 memorandum and order, the trial court found that appellant was not entitled to receive compensation based on an unjust enrichment claim because appellant was unable to satisfy the second and third prongs under the Maryland test. Based on its findings that "[t]he [c]ommission, [al]though discounted, was paid by the Landlord for whom the tenant was procured," the court concluded that "[n]o additional [c]ommission [was] due by [appellee] under any theory of Unjust Enrichment." Specifically, continued the lower court, appellant failed to prove that appellee had an appreciation or knowledge of the benefit, as appellee "was not involved in the Lease negotiations between [King Associates] and Rejnaj." Moreover, "[h]ad [appellant] not been paid by [King Associates], [the third element] might have some merit ... but under the facts of this case [appellant] having been paid, there is no inequity."

Applying the facts of the case *sub judice* to the requisite elements under *Kline,* we arrive at the same conclusion. The first element, in our view, was satisfied, as a benefit was conferred upon appellee by appellant; however, as the trial court correctly determined, the second and third elements were not satisfied. In order to prove unjust enrichment, appellant would have had to establish that appellee, the recipient of the alleged benefit, appreciated or knew of the Rejnaj tenancy. Such knowledge or appreciation was not demonstrated, however, as appellee had no knowledge of the negotiations between King Associates and Rejnaj. On the contrary, the court found that appellee specifically rejected the Rejnaj proposal in its December 16, 1996 letter to appellant. Furthermore, appellant was unable to establish any inequity which would prohibit appellee from retaining the benefits of the Rejnaj tenancy without payment of its value—the [c]ommission. As noted by the trial court, appellant *was* paid a four percent commission. King Associates paid appellant the com-

mission, then sought reimbursement from appellee.[4] To require appellee to pay another four percent commission would be wholly contrary to any of the grounds for the imposition of such an equitable remedy.

We disagree with appellant's contention that the trial court "permit[ted][a]ppellee to vitiate its agreement to pay [a]ppellant a commission on the ground of 'equity' simply because [a]ppellant happened to be paid a separate commission by King Associates." As stated above, appellee's obligations under the agreement were discharged, not on the grounds of equity, but on the grounds of basic contract law. Appellant's unjust enrichment claim fails, not because the trial court permitted appellee to vitiate the parties' agreement, but because it failed to prove the requisite elements.

■ In its memorandum and order, the trial court noted the inequitable manner in which appellant attempted to recover from appellee:

Within a day of the receipt of the discounted check from [King Associates] in January 1999, [appellant] made a "demand" for payment from [appellee].... Conspicuously absent from this trial however is any communication from [appellant] to [appellee], after [appellant] commenced direct negotiations with [King Associates] that led to [King Associates'] lease of the demised premises to Rejnaj. The conclusion is inescapable to the [c]ourt that neither [appellant] nor [appellee] believed that [appellant] was due a fee from [appellee] as a result of the Lease entered into between [King Associates] and Rejnaj. This claim is an afterthought by [appellant], and the absence of any supporting documentation, other than that submitted at trial, in part, causes the [c]ourt to disbelieve [appellant's] testimony....

4. In the collateral litigation, King Associates and appellee entered into a Lease Termination and Settlement Agreement in December 1998, whereby appellee was to pay King Associates $430,000. This figure represented any remaining obligations under the Take–Away Lease, as well as reimbursement for the commission paid by King Associates to appellant.

It is perfectly consistent with reasonable business practices that [King Associates] would pay a commission to [appellant], the cost of which [King Associates] tried to pass on to [appellee], the defaulting tenant in the collateral litigation.

The well-established doctrine of unclean hands prevents a party guilty of inequitable conduct, relating to the matter in which relief is sought, from receiving equitable relief. *Hlista v. Altevogt,* 239 Md. 43, 48, 210 A.2d 153 (1965). The doctrine does not require a plaintiff to be blameless in order to succeed on a claim of unjust enrichment. Rather, unjust enrichment will be barred only if the plaintiff's improper conduct is the source of his or her equitable claim. "What is material is not that the plaintiff's hands are dirty, but that he [or she] dirties them in acquiring the right he [or she] now asserts.'" *Adams v. Manown,* 328 Md. 463, 476, 615 A.2d 611 (1992). Because appellant engaged in inequitable practices in order to acquire a right to the commission at issue, any equitable relief under a theory of unjust enrichment is barred by the equally well-established doctrine of unclean hands.

### III

At trial, appellant attempted to impeach Dillick, appellee's representative, by referring to certain portions of the deposition transcript of Steven Scheinthal, appellee's designated representative under Md. Rule 2–412(d). Appellant contends that the trial court's denial of the request constituted clear error such that would warrant a reversal of the lower court. Appellee counters that the court never denied appellant's request, because appellant never offered the transcript into evidence. "Indeed, quite the opposite is true," appellee posits, the trial judge "made it clear that [a]ppellant was free to offer this deposition testimony as evidence."

Appellant points us to the following discussion regarding the Scheinthal deposition, which occurred on January 10, 2001:

[APPELLANT'S COUNSEL]: Okay. Bear with me one minute. Well, again, this is Mr. [Scheinthal's] deposition.

THE COURT: Which we'll deal with tomorrow.

[APPELLANT'S COUNSEL]: In terms of—

THE COURT: I'm not going to continue to repeat myself, [appellant's counsel].

. . .

[APPELLANT'S COUNSEL]: No, I didn't understand, but—

THE COURT: You understood what I just said.

[APPELLEE'S COUNSEL]: No, I understood, Your Honor. I just—now I do, but I didn't understand that I couldn't impeach [Dillick].

THE COURT: You can't impeach him with somebody else's deposition.

[APPELLANT'S COUNSEL]: But he's a corporate representative and Mr. [Scheinthal] is a corporate representative.

In support of its position that the trial court not only would have permitted the use of Scheinthal's deposition, but encouraged such a use, appellee relies on the following colloquy, which occurred one day after the above excerpt:

[APPELLANT'S COUNSEL]: . . . And part of the problem that I had in questioning Mr. [Dillick] was that I-my game plan was to go through quite a bit of impeachment, and there were several instances where Mr. [Dillick] had contradicted Mr. [Scheinthal], and vice versa.

THE COURT: Well, why don't you get the same effect by simply introducing either all or those portions of the corporate designee's deposition?

Generally, we will not determine the merits of an issue unless it appears from the record to have been raised during the course of trial. Rule 8–131(a). It is clear from the above excerpts that appellant's counsel failed to offer the deposition testimony into evidence. We were unable to find any reference in the transcript to the trial court's refusal to admit portions of the Scheinthal deposition. Indeed, the trial court suggested to counsel that he *should* introduce the Scheinthal

deposition. Because we were unable to perceive any reference to an attempt by appellant's counsel to offer such testimony into evidence, we decline to reach the merits of appellant's argument.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**